676 So.2d 394 (1996)
Virginia Gail LARZELERE, Appellant,
v.
STATE of Florida, Appellee.
No. 81793.
Supreme Court of Florida.
March 28, 1996.
As Revised July 11, 1996.
Rehearing Denied July 11, 1996.
*398 James B. Gibson, Public Defender and Christopher S. Quarles, Assistant Public Defender, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General and Gypsy Bailey, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
Virginia Gail Larzelere appeals her conviction of first-degree murder and the trial court's imposition of the death penalty. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm the conviction and sentence.
The appellant was married to Norman Larzelere (the victim), a dentist, and she worked as the office manager for his dentistry practice. On March 8, 1991, at approximately one o'clock in the afternoon, a masked gunman came into the victim's dental office, chased the victim, shot him with a shotgun, and fled. The victim died within a short time after being shot. At the time of the shooting, a dental assistant, a patient, and the appellant were in the office.
The appellant and her adult son, Jason Larzelere,[1] were charged with the victim's murder. The State's theory was that the appellant and Jason conspired to kill the victim to obtain approximately $2 million in life insurance and $1 million in assets. Jason and the appellant were tried separately. The appellant was tried first.
The State presented the following evidence at the appellant's trial. Two men testified that they had affairs with the appellant during her marriage to the victim and that the appellant asked them to help her have her husband killed. Two other witnesses, Kristen Palmieri and Steven Heidle, were given immunity and testified to a number of incriminating actions and statements made by the appellant and Jason regarding the murder. Specifically, their statements reflected that the night before the murder the appellant sent Jason to a storage unit to pick up documents, which included the victim's will and life insurance policies; that the appellant told Jason after the murder, "Don't worry, you'll get your $200,000 for taking care of business"; that the appellant told both witnesses that Jason was the gunman and that he "screwed up ... he was supposed to be there at 12:30, but he was a half hour late, so [the dental assistant] and a patient were there. That's why I had to fake a robbery."; that the appellant directed the two witnesses to dispose of a shotgun and a .45 handgun by having them encase the guns in concrete and dump them into a creek; and, that, in the days following the murder, Jason and the appellant reenacted the murder, with Jason playing the role of the gunman and the appellant playing the role of the victim. With Heidle's assistance, police recovered the guns from the creek but were unable to conclusively determine whether the shotgun was the murder weapon.
Additional testimony reflected that the appellant gave several conflicting versions of the murder to police, with differing descriptions of the gunman and the vehicle in which he left. The patient who was present at the time of the murder heard the victim call out just after he was shot, "Jason, is that you?"
*399 It was further established that over the six-year period preceding the murder, the appellant obtained seven different life insurance policies on the victim and that within the six months preceding his death, the appellant doubled the total amount payable on his life from over $1 million to over $2 million. Although the victim assisted in obtaining these policies, it was shown that the appellant was the dominant motivator in securing the policies. In addition, evidence was introduced to show that the appellant gave false information and made false statements to obtain the policies (in securing the policies she falsely represented to several insurance agents that pre-existing policies had been cancelled, did not exist, or were being replaced by the new policy). Further, soon after the victim's death, the appellant filed a fraudulent will, which left the victim's entire estate to the appellant. The fraudulent will was prepared on the same date one of the largest insurance policies on the victim's life became effective.
In her defense, the appellant presented evidence in an attempt to show that her inconsistent versions of the murder were due to her state of mind due to the distress of having just lost her husband; that the victim assisted in obtaining all of the insurance policies; that the appellant's lovers did not think she was serious about having her husband killed; that Heidle and Palmieri were not believable and perjured themselves; and that Heidle and Palmieri were unable to obtain incriminating statements from the appellant after they had been requested to do so by police.
The jury found the appellant guilty as charged.
No evidence was presented by either side at the penalty phase proceeding. The jury recommended death by a seven-to-five vote. In his sentencing order, the trial judge found the following two factors in aggravation: cold, calculated, and premeditated and committed for financial gain. He found no statutory mitigating factors, but he did find the following nonstatutory mitigating factors: ability to adjust and conform to imprisonment (marginal weight); and the appellant was not the shooter (insignificant weight due to fact that appellant was the mastermind behind the killing). Finding that the two aggravating factors outweighed the relatively minor mitigating evidence, the trial judge sentenced the appellant to death.
Following the appellant's trial, Jason was tried and acquitted of all charges.

GUILT PHASE
Appellant raises twelve issues regarding her conviction phase proceeding. First, she contends that the trial judge improperly limited her impeachment of Stephen Heidle, one of the State's key witnesses. Appellant attempted to introduce the testimony of two witnesses who would have testified as to Heidle's unsavory reputation for truth and veracity. After hearing the proffered testimony of the witnesses, however, the trial judge excluded this testimony on the grounds that the witnesses' knowledge of Heidle was too limited and that the community from which their knowledge arose was too small to establish sufficient reliability. Appellant argues that these were the only witnesses who could testify concerning Heidle's reputation for truthfulness given his limited exposure to others in the months preceding the murder and that the failure to allow this testimony deprived the appellant of a fair trial.
Under section 90.609, Florida Statutes (1991), a party may attack the credibility of a person by introducing character evidence in the form of reputation provided that the evidence relates only to the person's reputation for truthfulness. Section 90.405 governs the type of evidence that may be used to prove reputation. As a predicate to the introduction of such evidence, a foundation must be laid to prove that the witness testifying as to reputation is aware of the person's general reputation for truthfulness in the community. Charles W. Ehrhardt, Florida Evidence § 405.1 (1995 ed). Essentially, it must be established that the community from which the reputation testimony is drawn is sufficiently broad to provide the witness with adequate knowledge to give a reliable assessment. This assessment must be based on more than "mere personal opinion, fleeting encounters, or rumor." Rogers *400 v. State, 511 So.2d 526, 530 (Fla.1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). Further, reputation evidence "must be based on discussions among a broad group of people so that it accurately reflects the person's character, rather than the biased opinions or comments of ... a narrow segment of the community." Ehrhardt, supra, § 405.1 at 197 (footnote omitted).
In this case, the proffered testimony of the two proposed witnesses indicated that they both knew Heidle from a very limited community segment and for a very limited period of time. They both knew Heidle through a small number of individuals from his association at gay bars. Moreover, each of the witnesses had known Heidle for less than four months before the murder occurred. After reviewing the proffered testimony, the trial judge declined to admit this reputation evidence based on the limited amount of time the witnesses had known Heidle, the limited number of people from whom this reputation evidence was gathered, the extremely narrow section of the community from which the witnesses knew Heidle, and the fact that the testimony would be based largely on personal opinion and rumor. Under these circumstances, we cannot say that the trial judge abused his discretion in refusing to admit this testimony. See Heath v. State, 648 So.2d 660 (Fla.1994) (trial court has wide discretion in ruling on the admissibility of evidence and its rulings will not be disturbed absent an abuse of discretion), cert. denied, ___ U.S. ___, 115 S.Ct. 2618, 132 L.Ed.2d 860 (1995); Welty v. State, 402 So.2d 1159 (Fla.1981) (same); Wisinski v. State, 508 So.2d 504 (Fla. 4th DCA) (trial court did not abuse its discretion in refusing to admit reputation testimony given the small number of people, the limited cross-section, and the relatively short period of time on which the reputation testimony was based), review denied, 518 So.2d 1279 (Fla.1987); Gamble v. State, 492 So.2d 1132 (Fla. 5th DCA 1986) (trial judge has wide discretion in admitting or excluding reputation testimony; one learns of another's general reputation in a community over a period of time and through miscellaneous contact with many people).
Even were we to find that the trial judge abused his discretion in excluding this testimony, we would find such error to be harmless. Defense counsel conducted an extensive cross-examination of Heidle and impeached him with evidence that he had an illegal identification card, had a pending DUI charge, had committed perjury, and had lied to police. The State even conceded to the jury that Heidle probably had not testified truthfully as to the full extent of his involvement in this crime. Consequently, we find beyond a reasonable doubt that the exclusion of this evidence did not have an effect on the outcome of the jury's verdict. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
In her next issue, appellant argues that the trial judge erroneously denied her motion for mistrial, which was based on Kristen Palmieri's statement that Jason had used cocaine in her presence. The record reveals that, before Palmieri testified, the State stipulated that evidence regarding Jason's purported drug use was inadmissible. As a result, Palmieri was instructed to avoid mentioning this subject. During her testimony, however, she inadvertently made the following statement in discussing the victim's funeral: "[A]s I was getting dressed downstairs, Jason proceeded to come downstairs and do coke in the tanning room in front of me." Defense counsel immediately moved for a mistrial. The trial judge denied the motion but struck the offensive testimony and instructed the jury to disregard it. According to appellant, the motion should have been granted because the introduction of testimony that the appellant's son and co-conspirator was snorting cocaine prior to the victim's funeral could not have been disregarded by the jury and because it implicated the appellant based on "guilt by association." We disagree. This statement was not solicited by the State, was apparently inadvertent on the part of the witness, and was in no way suggestive of the appellant's guilt. Even though the State's theory was that the appellant and Jason committed this crime together, the appellant was portrayed as the orchestrator of the crime and no reference was made to any drug use on her part. We find that this brief reference to Jason's drug use *401 was insufficient to warrant a mistrial given its limited nature and the trial court's curative instructions. Cf. Craig v. State, 510 So.2d 857, 865 (Fla.1987) ("We are not persuaded that any prejudice flowed from the evidence of illegal drug use when there was ample direct evidence of appellant's guilt ... of first-degree murder."), cert. denied, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988).
Appellant also asserts that the trial judge erred in refusing to specially instruct the jury. The appellant asked the judge to instruct the jury that the jury should consider the witnesses' interest in the outcome of the case; that the fact one party called more witnesses and introduced more evidence should not necessarily result in a verdict for that side; that the testimony of police officers should not be given more or less weight than the testimony of other witnesses; and that accomplice testimony must be scrutinized with great care. The appellant also requested that the jury be given the former standard jury instruction on circumstantial evidence. The trial judge refused to give these instructions. Although the appellant concedes that most of these instructions are covered in the standard jury instructions, she asserts that the requested instructions were warranted because they would have offered a more thorough and accurate explanation of the applicable law. Further, she asserts that the requested instructions on circumstantial evidence and credibility of the police are not covered by the standard instructions and that the failure to give her requested instructions deprived her of due process.
As conceded by the appellant, all but two of the requested instructions are covered by the standard jury instructions. We find that the standard instructions provide adequate guidance in this regard. As to the other two instructions, we note that the appellant withdrew her requested instruction regarding the credibility of police, and we find her requested instruction on circumstantial evidence was properly denied. In 1981, this Court eliminated the circumstantial evidence instruction from the standard instructions. See In re Use by Trial Courts of Std. Jury Instr. in Crim. Cases, 431 So.2d 594 (Fla.), modified, 431 So.2d 599 (Fla.1981). In eliminating this instruction, we did state that judges could continue to use the instruction if, in their discretion, they felt it was appropriate. Nevertheless, we concluded that "the giving of the ... instructions on reasonable doubt and burden of proof ... renders an instruction on circumstantial evidence unnecessary." Id. at 595.
Next, appellant contends that the trial judge erred in admitting selected portions of taped statements and in refusing appellant's request to introduce the complete statements. At trial, the State introduced selected portions of taped statements the appellant and Jason made to police. Defense counsel objected to the introduction of this evidence and requested, under the "doctrine of completeness" and section 90.108, Florida Statutes (1991), that the entire tapes be introduced. The judge refused to allow the statements to be played in their entirety during the State's case-in-chief on the ground that the defense had not established prejudice by the partial introduction of the tapes at that time. The judge stated that the defense could introduce the tapes in their entirety during its case-in-chief. The appellant argues that a showing of prejudice is not required, that section 90.108 allows an adverse party to require the contemporaneous introduction of the entire taped statements, and that the failure of the court to allow this testimony deprived appellant of a fair trial.
Section 90.108, Florida Statutes (1991), provides in pertinent part:
When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered contemporaneously.
This rule is known as the "rule of completeness," and its purpose is to avoid the potential for creating misleading impressions by taking statements out of context. Ehrhardt, supra, § 108.1. Under this provision, once a party "opens the door" by introducing part of a statement, the opposing party is entitled to contemporaneously bring out the remainder *402 of the statement in the interest of fairness. Long v. State, 610 So.2d 1276 (Fla.1992). This right, however, is not absolute. For instance, in Correll v. State, 523 So.2d 562, 566 (Fla.), cert denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988), we stated:
Ordinarily, a defendant's statement should be introduced into evidence in its entirety, absent totally extraneous matters. However, the trial court here concluded that the matters contained in the last portion of Correll's statement were irrelevant. We cannot say that the judge abused his discretion in so ruling, particularly since he made it clear that Correll was at liberty to introduce the redacted portion himself. Even Correll must not have believed that the redacted portion was of great significance because he did not seek to introduce it in his case-in-chief, even though he presented several witnesses in his defense.
See also Mulford v. State, 416 So.2d 1199, 1201 (Fla. 4th DCA 1982) (section 90.108 gives parties "only a qualified right to seek the admission" of an entire statement) (emphasis added); Ehrhardt, supra, § 108.1 at 35 ("Under ... section 90.108, the remainder to the document or writing is not automatically admissible when requested or offered by the adverse party."). Under a plain reading of the statute, parties may seek the introduction of other statements when those statements "in fairness ought to be considered contemporaneously" with the introduction of the partial statement. § 90.108, Fla. Stat. Such a fairness determination falls within the discretion of the trial judge. Correll (trial judge did not abuse his discretion in holding matters irrelevant).
In this case, the State asked to introduce only selected portions of the statements made by the appellant and Jason, contending that the remaining portions of the statements were not relevant. The trial judge allowed the selected portions to be played over defense counsel's objection because defense counsel was unable to establish how the appellant would be prejudiced by the introduction of the partial statements. The trial judge ruled, however, that the defense could introduce the remaining portions of the statements during its case-in-chief. We find that the trial judge erred in requiring the defense to show prejudice. As indicated above, the correct standard is whether, in the interest of fairness, the remaining portions of the statements should have been contemporaneously provided to the jury. After a full reading of the record, however, we find this error to be harmless because there is no reasonable probability that exclusion of the redacted statements affected the outcome of the jury's verdict. State v. DiGuilio, 491 So.2d 1129 (Fla.1986). The statements introduced by the State constituted only a finite portion of the extensive record in this case. Moreover, as we found in Correll, even the appellant must not have believed that the redacted portions of the statements were of great significance because she did not seek to introduce them in her case-in-chief even though the trial judge specifically stated that she could do so and even though she produced a number of witnesses.
In her fifth claim, the appellant maintains that the trial judge improperly denied her motion to discharge counsel and various other motions connected to that request. Appellant was represented by two attorneys, John Wilkins and John Howes. Both of these attorneys also represented Jason. The record reflects that both the trial judge and the State were concerned with the conflict of interest that might occur as a result of this dual representation. As a result, the trial judge extensively advised and questioned appellant about the potential for conflict in this dual representation, after which the trial judge made a specific finding that appellant knowingly and intelligently waived the right to raise any apparent or possible conflicts.
After the jury recommended a sentence of death but before the trial judge imposed sentence, appellant filed a pro se motion for a new trial alleging that the trial judge erred in accepting her waiver of conflict-free counsel. She also raised a number of substantive issues regarding alleged errors at trial and ineffective assistance of counsel. Thereafter, the judge conducted a hearing on the motion in which he questioned both appellant and her counsel. At the hearing, appellant requested a continuance asserting that she *403 needed to bring in F. Lee Bailey and others to support her motion. The trial judge denied the motion for continuance, ruling that appellant had to state the grounds to support the motion at the instant hearing. Appellant stated she would rely on her motion. The judge then denied the motion to discharge, finding there had been no showing of ineffective assistance or conflict that would warrant discharging appellant's counsel. He offered appellant the opportunity to represent herself, which she declined. Thereafter, Wilkins asked to be discharged, which request the trial judge also denied.
An actual conflict of interest that adversely affects counsel's performance violates the Sixth Amendment of the United States Constitution. Barclay v. Wainwright, 444 So.2d 956 (Fla.1984). Nevertheless, a defendant's fundamental right to conflict-free counsel can be waived. United States v. Rodriguez, 982 F.2d 474 (11th Cir.), cert. denied, 510 U.S. 901, 114 S.Ct. 275, 126 L.Ed.2d 226 (1993); Woseley v. State, 590 So.2d 979 (Fla. 1st DCA 1991). For a waiver to be valid, the record must show that the defendant was aware of the conflict of interest, that the defendant realized the conflict could affect the defense, and that the defendant knew of the right to obtain other counsel. 982 F.2d 474 at 477. It is the trial court's duty to ensure that a defendant fully understands the adverse consequences a conflict may impose. Winokur v. State, 605 So.2d 100 (Fla. 4th DCA 1992), review denied, 617 So.2d 322 (Fla.1993).
In this case, the trial judge specifically advised appellant of the possible conflict of interest that could arise from the dual representation. He then extensively questioned her to determine whether she understood the potential for conflict and her right to obtain other counsel. Clearly, on this record the trial judge met the burden of assuring that appellant's waiver was made voluntarily, knowingly, and intelligently. Once the jury recommended death, however, appellant chose to revoke this waiver and wanted new counsel. At that point in the proceedings, the trial judge found that no conflict of interest or other basis existed to warrant removal of counsel. Under these circumstances, we find that the trial judge properly denied the motions to discharge counsel. First, appellant has failed to show how she was prejudiced by the continued representation. See, e.g., Roberts v. State, 573 So.2d 964 (Fla. 2d DCA 1991) (once defendant voluntarily chooses to proceed with dual representation, defendant must show prejudice in the form of actual conflict to succeed in a subsequent claim for ineffective assistance of counsel); Morgan v. State, 550 So.2d 151 (Fla. 3d DCA 1989). Second, appellant had no right to have different counsel appointed after the trial judge found no existing conflict of interest. Hardwick v. State, 521 So.2d 1071 (Fla.) (no constitutional right exists to obtain different court appointed counsel), cert. denied, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988). Additionally, the trial judge conducted a proper Nelson inquiry in the face of appellant's assertions of ineffective assistance of counsel by allowing appellant to state her reasons for her claims on the record, by questioning counsel regarding those assertions, and by specifically finding that the claims were meritless and that counsel was competent as to those assertions. Hardwick; Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973). Consequently, we find this claim to be without merit.
Sixth, appellant claims that the trial judge erred in failing to grant her motion for new trial, which was based on allegations that the jury had been contaminated by extrajudicial information. After the jury convicted the appellant (but before the penalty phase proceeding began), a female, who was unconnected to this case, approached three jurors in the courthouse parking lot and threatened to blow up a juror's car. After the incident was reported to the trial judge, he questioned the jurors individually in the presence of counsel for the State and the appellant to determine whether the jurors were prejudiced by the incident. After ascertaining the facts, the trial judge asked the jurors whether they thought that the appellant was in any way responsible for the incident. Each of the jurors responded in the negative. The judge also asked the jurors whether the incident affected their ability to *404 serve as impartial jurors, to which they also responded in the negative. The appellant moved for a new guilt phase based on contamination of the jury and moved for a mistrial of the penalty phase on the same grounds. The trial judge denied the motions, finding that this incident did not prejudice or taint the jury and that the jurors could remain impartial.
The incident occurred after the completion of the guilt phase. Consequently, it in no way affected the jury's verdict as to appellant's conviction. As to the penalty phase, the judge determined, after inquiry, that the incident did not prejudice the jury in any way and that the jurors could remain impartial. Because this incident occurred after the conviction phase but before the penalty phase, the test for determining whether a new jury for the penalty phase was warranted is somewhat comparable to those cases involving pretrial publicity wherein a determination must be made as to whether a juror can be fair and impartial despite the pretrial publicity. Cf. Provenzano v. State, 497 So.2d 1177 (Fla.1986) (test for determining prejudice from pretrial publicity is whether publicity caused any accompanying prejudice, bias, or preconceived opinions about case), cert. denied, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987). Nonetheless, because the conviction and penalty phase proceedings of a death penalty case are so intertwined,[2] the problem presented is more akin to those cases involving juror contamination or misconduct during the course of the proceedings. While it is appropriate to inquire into the thought processes of a juror in the first instance, it is inappropriate to do so in the latter. See, e.g., State v. Hamilton, 574 So.2d 124 (Fla.1991) (inappropriate for judge to inquire into jurors' thought processes as to whether presence of materials in jury room was prejudicial). Under the unique circumstances of this case, however, we find that the trial judge properly determined that the jury had not been tainted by the incident even if the trial judge improperly inquired as to whether the jurors were prejudiced by this incident. The jurors saw no nexus between the defendant and the threat, and the incident did not expose them to any non-record information that was prejudicial. Consequently, we find that no reasonable possibility exists that the incident affected the jury's verdict. McKinney v. State, 579 So.2d 80 (Fla.1991) (prejudice exists where there is a reasonable possibility that the contact affected the jury's verdict).
In a similar claim, appellant asserts that she is entitled to a new trial based on juror misconduct. After the completion of the penalty phase, one of the jurors (Juror Kelley) participated in an interview with a writer in which she alleged that numerous improprieties occurred during the trial.[3] Based on these allegations of juror misconduct, the appellant moved for a new trial. The trial judge then interviewed Juror Kelley, as well as all of the other jurors. After conducting the interviews, the trial judge denied the motion. In an extremely detailed, well-reasoned order, the trial judge found that Juror Kelley's testimony was internally inconsistent, was unreliable, conflicted with the testimony of the other eleven jurors, was based on speculation and confusion, and exhibited bias and partiality. We find that the trial judge properly denied the motion after finding that Juror Kelley's allegations were without merit.[4]
In her next claim, appellant asserts that the trial judge erred in admitting bullets appellant found at her residence and turned *405 over to police. Appellant contends the bullets were irrelevant and prejudicial. The record shows that appellant told the police she dug the bullets out of a fence at her home after she reported a drive-by shooting at her home. The State introduced the bullets to show that the appellant attempted to misdirect the police investigation away from her. At trial, a firearms expert testified that the bullets had never been fired. We find that the trial judge properly admitted the bullets as "after the fact evidence" of a desire to evade prosecution, which was relevant to the issue of guilt. Anderson v. State, 574 So.2d 87 (Fla.) (consciousness of guilt could be inferred from defendant's after-the-fact statements, and, thus, was relevant to the material issue of guilt), cert. denied, 502 U.S. 834, 112 S.Ct. 114, 116 L.Ed.2d 83 (1991); Straight v. State, 397 So.2d 903 (Fla.) (after-the-fact evidence of a desire to evade prosecution is relevant to the consciousness of guilt, which may be inferred from such conduct), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981).
Appellant also argues that the trial judge improperly denied her motion to dismiss the indictment, which was based on the claim that the State illegally intercepted a conversation she had with Jason in a holding cell. Because appellant had invoked her constitutional right to silence and was represented by counsel before the recording took place, she contends that the police acted wrongfully in recording the conversation, which, in turn, warrants dismissal of the charges against her. Appellant acknowledges that a person loses much of the right to an expectation of privacy during incarceration. See, e.g., Hudson v. Palmer, 468 U.S. 517, 528, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393 (1984) (Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell); State v. McAdams, 559 So.2d 601 (Fla. 5th DCA 1990) (recording of conversation between two defendants in police car after defendants had invoked constitutional rights not illegal). Appellant argues, however, that this case is distinguishable from those cases because here the State fostered the illusion of privacy in placing her and Jason in the cell together. See State v. Calhoun, 479 So.2d 241 (Fla. 4th DCA 1985) (fostering illusion of privacy when placing two individuals in holding cell after invocation of constitutional rights warranted suppression of recorded statements). Accordingly, appellant argues that the charges should be dismissed. We do not agree that the State acted wrongfully in recording the conversation between the appellant and Jason. Unlike the situation in Calhoun, appellant did not ask to speak to her son privately; they were simply placed in a cell together before a hearing. Further, even were we to find that misconduct occurred, we would still find that the trial judge properly denied the motion. Under the circumstances of this case, the proper remedy for such misconduct would have been for the trial judge to suppress the evidence obtained as a result of the misconduct rather than to dismiss the indictment.[5] In this case, both parties acknowledge that the recording of the conversation was worthless. Consequently, there was nothing to suppress.
In a similar issue, appellant contends that the trial judge erroneously excluded the testimony of an investigator who was involved in the recording of this conversation. Defense counsel attempted to call the investigator to establish that the police would go to great lengths to prove appellant's guilt. The trial judge disallowed the questioning of the investigator regarding the "bugging" of appellant's cell, finding the testimony to be irrelevant and prejudicial. We find that the trial judge did not abuse his discretion in excluding this testimony.
In her tenth claim, appellant alleges that the trial judge erroneously denied her motion for change of venue, which she filed because of prejudicial pretrial publicity. The record indicates that appellant filed a motion for change of venue, that the trial judge took the motion under advisement, and that the *406 trial judge denied the motion after a jury was selected. After reviewing the record of the voir dire examination, we find that the trial judge properly denied the motion. Although many of the prospective jurors had read or heard media reports about the murder, the extensive questioning of those jurors by the trial judge and by the attorneys for both sides reflects that the jurors' knowledge of the incident was not such that it caused them to form any prejudicial, preconceived opinions about the case. Pietri v. State, 644 So.2d 1347 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2588, 132 L.Ed.2d 836 (1995); Provenzano (pretrial publicity is expected in certain cases, and, standing alone, does not necessitate a change of venue; the critical factor is the extent of the prejudice or lack of impartiality among potential jurors that may accompany the knowledge of the incident).
In her next claim, appellant argues that the trial judge improperly denied her motion for judgment for acquittal because the evidence is legally insufficient to support the guilty verdict. According to appellant, the evidence is almost entirely circumstantial and failed to preclude the reasonable possibility that the appellant was not involved in any way with her husband's murder. We find this claim to be totally without merit. The evidence introduced at trial reflected that the appellant planned and directed the murder, identified Jason as the gunman, and directed the disposal of the murder weapon.
In her final guilt phase claim, appellant argues that the trial judge improperly admitted a number of Jason's hearsay statements. The trial judge admitted the statements under section 90.803(18)(e), the co-conspirator hearsay exception. According to appellant, the trial judge erred in admitting these statements because the State failed to establish, using evidence independent of the hearsay statements, that a conspiracy existed between Jason and the appellant. We find this claim to be without merit. The facts presented at trial established, independent of Jason's statements, that appellant's calculated plan to murder the victim involved the conspiratorial association of Jason.

PENALTY PHASE
We turn now to the issues regarding the penalty phase proceeding. In her first claim, appellant contends that the trial judge erroneously found that the murder was both cold, calculated, and premeditated (CCP) and committed for financial gain. Appellant asserts that these two aggravating circumstances are duplicative because both are based on the fact that the appellant had her husband murdered in furtherance of her plan to receive life insurance proceeds. In making this argument, the appellant concedes that this Court has previously rejected a similar argument in other cases. See Fotopoulos v. State, 608 So.2d 784 (Fla.1992), cert. denied, 508 U.S. 924, 113 S.Ct. 2377, 124 L.Ed.2d 282 (1993); Echols v. State, 484 So.2d 568 (Fla.1985), cert. denied, 479 U.S. 871, 107 S.Ct. 241, 93 L.Ed.2d 166 (1986). She argues, however, that those cases were wrongly decided. We disagree. As we stated in those cases, the facts in a given case may support multiple aggravating factors provided the factors are not based on the same essential feature of the crime. In this case, the aggravating circumstance of committed for financial gain was based on the evidence that appellant killed her husband to collect life insurance; the factor of CCP was based on evidence that she meticulously staged her husband's murder to look as though it were committed during a robbery. Under these circumstances, we do not find that the trial judge improperly duplicated these two aggravating factors.
Nor do we find the death penalty in this case to constitute a disproportionate sentence even though two of the State's key witnesses were apparently not prosecuted despite their involvement in this crime and even though Jason was acquitted. When a codefendant (or coconspirator) is equally as culpable or more culpable than the defendant, disparate treatment of the codefendant may render the defendant's punishment disproportionate. Downs v. State, 572 So.2d 895 (Fla.1990), cert. denied, 502 U.S. 829, 112 S.Ct. 101, 116 L.Ed.2d 72 (1991); Slater v. State, 316 So.2d 539 (Fla.1975). Thus, an equally or more culpable codefendant's sentence is relevant to a proportionality analysis. *407 Cardona v. State, 641 So.2d 361 (Fla.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995). Disparate treatment of a codefendant, however, is justified when the defendant is the more culpable participant in the crime. Hayes v. State, 581 So.2d 121 (Fla.), cert. denied, 502 U.S. 972, 112 S.Ct. 450, 116 L.Ed.2d 468 (1991).
In this case, the trial judge specifically examined the appellant's culpability, stating:
The evidence established beyond a reasonable doubt that, although [the appellant] was not the triggerman, she was present for the murder actively participating in carrying out the murder which she planned in a cold and calculated manner. Her participation was not relatively minor. Rather she instigated and was the mastermind of and was the dominant force behind the planning and execution of this murder and behind the involvement and actions of the co-participants before and after the murder. Her primary motive for the murder was financial gain, which motive was in her full control.
....
... Under no reasonable view of the evidence can it be said that the degree of culpability of Steven Heidle or Kristen Palmieri was equal to that of [the appellant]. [The appellant] was in charge and they were the subordinates with significantly lesser roles.
As indicated by the trial judge, we find that the evidence establishes beyond question that the appellant was the dominating force behind this murder and that she was far more culpable than the State's two key witnesses. Additionally, the evidence supports the judge's conclusion that the aggravating factors outweigh the mitigating factors. Consequently, we find that the appellant's sentence is not disproportionate. See, e.g., Garcia v. State, 492 So.2d 360 (Fla.) (prosecutorial discretion in plea bargaining with less culpable accomplices is not impermissible and does not violate the principles of proportionality), cert. denied, 479 U.S. 1022, 107 S.Ct. 680, 93 L.Ed.2d 730 (1986). In making this determination, we note that Jason's acquittal is irrelevant to this proportionality review because, as a matter of law, he was exonerated of any culpability.[6]
In her final claim, the appellant raises a number of issues regarding the constitutionality of Florida's death penalty scheme.[7] Most of the arguments raised under this claim have not been preserved for review. Further, almost all of the arguments have been previously rejected. We find that only one of appellant's arguments under this issue merits discussion; that is her claim that the aggravating circumstance of CCP is unconstitutionally vague. In this case, the trial judge provided the jury with the standard jury instruction on CCP. We have since determined that the standard instruction given in this case is, in fact, unconstitutionally vague. See Jackson v. State, 648 So.2d 85 (Fla.1994). We also stated in Jackson, however, that a claim that the CCP aggravating circumstance is unconstitutionally vague is procedurally barred unless a specific objection is made at trial. A review of the record reflects that defense counsel failed to properly preserve this issue for appeal; consequently, this issue is procedurally barred. Moreover, even were we to find this issue properly preserved, we conclude that *408 the giving of this instruction was harmless error because the facts of this murder as set forth earlier in this opinion establish that this murder was CCP under any definition. Foster v. State, 654 So.2d 112 (Fla.), cert. denied, ___ U.S. ___, 116 S.Ct. 314, 133 L.Ed.2d 217 (1995).
Accordingly, for the reasons expressed, we affirm Virginia Gail Larzelere's conviction for first-degree murder and sentence of death.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Jason Larzelere was adopted by the victim after he and the appellant were married.
[2] In this case, for example, neither side presented any evidence in the penalty phase proceeding, relying instead on the evidence presented in the conviction phase proceeding.
[3] She asserted that jurors discussed evidence before deliberations; that several jurors concluded the appellant was guilty during the first week of the four week trial; that one juror revealed information regarding Jason and a plea bargain; that several jurors perjured themselves about the parking lot incident; that, contrary to court order, several jurors read media accounts of the case; and that she herself was misled and pressured into finding the appellant guilty.
[4] Appellant also contends that the trial judge erroneously inquired into the thought processes of the jurors in questioning them about Juror Kelley's assertions. The record reflects that the judge properly questioned the jurors in an objective manner, asking questions only about any overt acts that might have prejudicially affected the jurors in reaching their own verdict.
[5] Contrary to appellant's assertions, the conduct at issue was not so egregious as to warrant dismissal due to a violation of Florida's due process clause. Cf. State v. Williams, 623 So.2d 462 (Fla.1993) (law enforcement personnel's manufacturing of crack cocaine for use in sting operation was so egregious as to warrant dismissal of charges).
[6] On this record, we are unable to determine what evidence was presented against Jason in his trial; however, it is obvious that some of the evidence that was admissible against the appellant would have been inadmissible against Jason.
[7] Appellant claims that: the CCP instruction is vague and arbitrarily applied; the death penalty statute is unconstitutional because it authorizes a death recommendation on the basis of a bare majority vote; the lack of a unanimous verdict as to any aggravating circumstance is unconstitutional; the jury is told its role is only advisory; the sentencing judge was selected by a racially discriminatory system; the statute unconstitutionally prevents the evenhanded application for appellate review; a number of the aggravating circumstances are unconstitutional because they do not rationally narrow the class of death-eligible persons; the use of the contemporaneous objection rule prevents the consistent application of the death penalty; special verdict forms should be provided; the criminal rules unconstitutionally forbid the mitigation of a death sentence; the death penalty is presumed where a single aggravating circumstance is found; juries are not allowed to consider sympathy; and electrocution is cruel and unusual punishment.