969 So.2d 430 (2007)
Timothy Joseph ALESSI, Appellant,
v.
STATE of Florida, Appellee.
No. 5D06-2995.
District Court of Appeal of Florida, Fifth District.
November 9, 2007.
*431 William J. Sheppard and D. Gray Thomas of Sheppard, White, Thomas & Kachergus, P.A., Jacksonville, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Robin A. Compton, Assistant Attorney General, Daytona Beach, for Appellee.
LAWSON, J.
Timothy Alessi appeals from an order denying his motion for postconviction relief, which alleged multiple claims of ineffective assistance of counsel during the criminal proceeding resulting in his conviction for first degree murder, for killing his wife, and related convictions for armed burglary and for the attempted murder of Mrs. Alessi's brother, Kevin Herron. With respect to all claims analyzed pursuant to the two-pronged test in Strickland *432 v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we affirm the trial court's order based upon our conclusion that these claims were either facially insufficient, or, where sufficient, that Mr. Alessi failed to demonstrate any prejudice resulting from his trial counsel's alleged deficient performance.
However, Mr. Alessi's postconviction motion raised two additional claims charging that trial counsel's performance was adversely affected by an actual conflict of interest. Unlike most ineffective assistance of counsel claims, prejudice is presumed when a defendant establishes ineffective assistance based upon a conflict of interest. Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). These claims require an examination of two threshold issues. The first is whether Sullivan should be applied in cases involving the types of conflicts alleged here. Although the scope of Sullivan's application is an open question at the federal level, we conclude that because the Florida Supreme Court continues to apply Sullivan to all types of conflict cases, we must do so as well. The second threshold issue involves an inconsistency between two panel decisions from this court, Burnside v. State, 656 So.2d 241 (Fla. 5th DCA 1995) and Cole v. State, 700 So.2d 33 (Fla. 5th DCA 1997), which use different tests to apply Sullivan. We conclude that Cole was decided correctly, and that the test recited in Burnside, if applied literally, does not accurately reflect the law. Applying the correct standard, we find that Mr. Alessi is entitled to relief with respect to one of his Sullivan claims. Therefore, we reverse as to that issue and remand with directions for a new trial.

Facts Relevant To All Claims
Mr. Alessi was an experienced police officer and expert marksman who was estranged from his wife at the time of her killing. The couple was getting a divorce, and Mrs. Alessi was living with her brother, Mr. Herron, and his wife. Prior to the killing, Mr. Alessi had repeatedly made statements evidencing an intent to kill his wife and her brother, stating that someone should "take them out," and that he should "go over there and blow them all away." He had also told others that he would be better off if Polly Alessi were dead.
On the day of the killing, Alessi went to Herron's house with a loaded handgun, and shot his wife twice from a distance of one to three feet, killing her. He also shot Mr. Herron three times, although Herron's injuries were not fatal. According to witnesses, Mr. Alessi then calmly left the home and walked to his truck to depart. Shortly afterward, Mr. Alessi called his sister and left a message on her recorder stating that he had shot and killed his wife and her brother and was "on the run." When Mr. Alessi saw his sister later that same day he told her that he "did something; it's very bad, it's very bad."
At trial, Mr. Alessi claimed self defense, and testified that Mr. Herron had first pulled a gun on him. According to Mr. Alessi's trial testimony, he was simply trying to defend himself against the armed attack by Mr. Herron when he accidentally shot his wife. The only other living eyewitnesses to the shooting, Mr. and Mrs. Herron, testified that Mr. Herron was unarmed at the time of the shooting, which occurred in the kitchen of their home, and that Mr. Herron retreated to the bedroom after being shot, where he retrieved a gun. Both Mr. and Mrs. Herron testified that Mr. Alessi left the house before Mr. Herron secured his gun. And, it is undisputed that Mr. Herron never fired a weapon.

Strickland Claims
We find it unnecessary to detail Mr. Alessi's numerous claims of deficient performance unrelated to conflicts of interest. *433 Some were properly found to be facially insufficient. With others, to the extent that Mr. Alessi could have established deficient performance, he could not have established prejudice. See Strickland, 466 U.S. at 669 & 694, 104 S.Ct. 2052 (To prevail on an ineffective assistance claim, the defendant must prove both that his counsel's actions amounted to deficient performance, i.e., "fell below an objective standard of reasonableness" and that the deficient performance prejudiced his defense, i.e., "but for counsel's unprofessional errors, the result of the proceeding would have been different."). We have carefully considered each claim, and conclude that none of the deficiencies alleged, if corrected, could have led the jury to believe that Mr. Alessi, an experienced police officer and expert marksman, accidentally shot his wife at a range of one to three feet, especially given his prior threats to kill her and his subsequent statements evidencing consciousness of guilt.
Therefore, we conclude that all of Mr. Alessi's Strickland claims were properly denied.

Additional Facts Relevant To Sullivan Claims
1. Delayed Disclosure Of The Murder Weapon.
Shortly after the shootings, Mr. Alessi's family hired attorney Huntley Johnson to represent Mr. Alessi at trial. In an early telephone conversation between Mr. Johnson and Mr. Alessi, Alessi informed Johnson that he was contemplating suicide. In response, Mr. Johnson told Mr. Alessi to "get rid of the gun"  the weapon Mr. Alessi had used in the shooting  which was obviously evidence in the murder case. Mr. Alessi followed his lawyer's advice and tossed or hid the gun in a storm drain. A week later, the two discussed the fact that Mr. Johnson would need to turn the gun over to the State. Mr. Alessi immediately agreed, and told Mr. Johnson where the gun was hidden. However, Johnson delayed his disclosure to the State for approximately four months.
At trial, the State argued that hiding the gun and delaying the disclosure of its location evidenced Mr. Alessi's consciousness of guilt. In response to the State's questions, Mr. Alessi attempted to explain that he was acting on the advice of counsel, but Mr. Johnson objected to the line of inquiry. At a bench conference, Mr. Johnson expressed his outrage that the State was pursuing this line of questioning, and the associated argument, when the prosecutor knew that Mr. Alessi had been acting on his advice and that he  not Mr. Alessi  was responsible for the long delay.
It is clear from Mr. Johnson's argument during the bench conference that he understood the conflict of interest that this issue presented, since he was a material witness to the facts being argued by the State as evidence of Mr. Alessi's guilt. Who better than Mr. Johnson to explain to the jury, under oath, that Mr. Alessi hid the gun at his direction and immediately disclosed the location so that Mr. Johnson could turn the gun over to police the first time that Johnson raised the issue with him?[1]
*434 Because of Mr. Johnson's objections, however, Mr. Alessi was not even able to fully explain the delay to the jury. Mr. Johnson's strategic decision  to object and attempt to keep the State from making this argument so that he could avoid the need to testify himself  simply did not work. The jury heard that Mr. Alessi hid the gun and that its location was not disclosed for four months. They heard, from Mr. Alessi, that his attorney told him to get rid of the gun because he was contemplating suicide. But, when the prosecutor asked Mr. Alessi to explain "why the decision was made to not disclose the location of the weapon that killed Polly for four months?," Mr. Johnson objected. The objection was sustained, and the jury never heard that it was Mr. Johnson who delayed the disclosure, not Mr. Alessi.
Then, in its closing argument, the State argued, without objection, that Mr. Alessi's decision to hide the gun, and his delay in disclosing its location, further evidenced his consciousness of guilt.
2. Fee Arrangement And Decision To Forego Expert Witnesses.
The retainer agreement between the Alessi family and Mr. Johnson established a fee of $135,000, which included "any services of investigators, or experts employed by undersigned attorney." Mr. Alessi's family testified at the evidentiary hearing that Mr. Johnson told them that he would seek "police experts" to go through the case and offer re-enactments and testimony regarding bullet projectories [sic], and that he would "have all kinds of experts on this case."
Additionally, Mr. Johnson's own investigator, Kirby Jordan, testified that early on in his involvement in the case, he recommended to Mr. Johnson that they secure expert testimony to support the defense theory that it was a reactionary shooting upon seeing Mr. Herron's gun. Mr. Jordan offered to locate an expert but Mr. Johnson said he would take care of it. About a month before trial, Mr. Jordan again asked about expert testimony. Mr. Johnson told Mr. Jordan that he would not be hiring experts because the Alessi family could not afford them. Mr. Jordan assumed that Johnson would ask the family for more money because "we all agreed that it was going to be a critical part of the case." Later, Mr. Johnson's explanation for not using experts shifted from lack of money to the fact that Mr. Johnson felt he had prepared the case without them, and did not think he needed one.
In his testimony at the evidentiary hearing, Mr. Johnson acknowledged the retainer agreement and that any money he would have spent on experts would have come from his fee. Mr. Johnson testified that he considered using experts, but explained that his decision not to hire an expert was strictly strategic, and had nothing to do with the fee arrangement. According to Mr. Johnson, his primary concern was that the State would hire an expert in response. Mr. Johnson testified that:
[B]ased on the reports that we had and the fact that the State did not have [an expert], we felt like we could make the argument sufficiently with the photographs and with the reports [and] that [our defense] could not be contradicted unless they had an expert. And we didn't want to get into doing experts when we thought we could make the argument . . . without an expert.
Mr. Johnson testified that he explained his reasoning to Mr. Alessi, who agreed with the decision. Testimony from Mr. Johnson's law partner also supported Mr. Johnson's position that Mr. Johnson did not pursue an expert witness for reasons unrelated to the cost.
*435 Also at the evidentiary hearing, in support of Mr. Alessi's claim, postconviction counsel called an expert in "officer-involved shootings, homicide investigation protocols, the dynamics of violent encounters and the use of deadly force," to demonstrate the kind of testimony that could have been developed to support Mr. Alessi's theory of self-defense.[2]
After considering all of the evidence, the trial court recognized the "compelling argument" that Mr. Johnson decided to forego experts because of the financial conflict of interest, but ultimately believed Mr. Johnson and found that his financial self-interest did not affect his decision to forego an expert. The court stated:
[F]rom testimony presented at the evidentiary hearing, there is nothing to show that Trial Counsel believed his representation would be adversely affected by the fee agreement. Trial Counsel testified at the November 21, 2005 evidentiary hearing herein that the defense team considered an expert . . . but based on the reports that they had, and the fact that the State did not have an expert, they felt as if they could make an argument sufficiently with photographs and reports. They felt these arguments could not be contradicted unless the State had an expert. They felt if they hired an expert, the State would likely hire one as well. Trial Counsel testified further that he had consulted with some others he felt had expertise in the field, and decided after all not to call an expert at trial. Trial Counsel's partner and Co-Counsel testified in the same hearing that there were discussions among herself, Trial Counsel and the Defendant resulting in the joint decision that they would not seek expert assistance because the evidence that they had, including the Medical Examiner's report, was sufficient to support the Defendant's theory of his defense.

Sullivan Claims
Claims of ineffective assistance based on conflict of interest have generally been analyzed under an exception to the standard two-pronged Strickland test. Prejudice is presumed "if the defendant demonstrates that counsel `actively represented conflicting interests' and that `an actual conflict of interest adversely affected his lawyer's performance.'" Strickland, 466 U.S. at 692, 104 S.Ct. 2052 (quoting Sullivan, 446 U.S. at 350, 100 S.Ct. 1708). This exception is commonly referred to as the Sullivan exception to Strickland.[3]
Our analysis is complicated by the fact that this case presents a threshold issue unresolved in the federal courts' application of Sullivan, which has never been expressly acknowledged or addressed by the Florida Supreme Court. That is, does Sullivan even apply to conflict of interest claims not involving an attorney representing multiple clients with competing interests in a criminal case? We will address this issue first. Next, we will address a conflict in two of our prior cases, Burnside and Cole regarding the standard for application of Sullivan.
1. Sullivan and Conflict Cases Not Involving Joint Representation.
Although not discussed in the briefs, a threshold question for analysis is *436 whether the Sullivan exception or the Strickland test applies when the conflict of interest alleged is a financial one, or involves a lawyer as a witness. Sullivan involved a conflict of interest based upon an attorney's representation of multiple defendants with conflicting interests. In Mickens v. Taylor, 535 U.S. 162, 174, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), the Supreme Court stated in dictum that since Sullivan, the federal circuit courts had "unblinkingly" applied the Sullivan exception to "all kinds of alleged attorney ethical conflicts" beyond the multiple representation scenario in Sullivan. Id. (quoting Beets v. Scott, 65 F.3d 1258, 1266 (5th Cir.1995) (en banc)). These included cases of successive representation conflicts as well as personal and financial conflicts of interest (such as one of the conflicts in the instant case). Id. They also included conflicts involving a lawyer as a witness, see, e.g., Mannhalt v. Reed, 847 F.2d 576, 581 (9th Cir.1988), the other conflict involved in this case.
The Supreme Court cautioned, however, that "the language of Sullivan itself does not clearly establish, or indeed even support, such expansive application." Id. at 175, 122 S.Ct. 1237. The Court noted that the presumed prejudice exception was needed in multiple representation cases because of the "high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice" but stressed that "[n]ot all attorney conflicts present comparable difficulties." Id. The Court was careful to say that it was not suggesting that one ethical duty was more important than another, but that the Sullivan prophylaxis was only necessary in situations in which the Strickland analysis was "inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." Id. at 176, 122 S.Ct. 1237. The Court concluded that the question of whether Sullivan applied to conflicts involving successive representation remained an "open question." Id.
Since Mickens, the federal circuit courts, including the Eleventh Circuit, have acknowledged that the Sullivan exception to Strickland is limited to joint representation and that extension of Sullivan to other conflicts of interest remains an open question. See, e.g., Schwab v. Crosby, 451 F.3d 1308, 1324-28 (11th Cir. 2006).
Despite this apparent pullback in the federal courts, the Florida Supreme Court has continued to apply the Sullivan exception beyond joint representation conflicts to successive representation and financial conflicts of interest. See Sliney v. State, 944 So.2d 270, 279 (Fla.2006) (successive representation); Mungin v. State, 932 So.2d 986, 1001 (Fla.2006) (successive representation); Brown v. State, 894 So.2d 137, 157 (Fla.2004) (financial conflict). In Brown, for example, the defendant alleged ineffective assistance based on his trial counsel's improper efforts to obtain the rights to the defendant's life story, poems and other works. The Supreme Court applied the Sullivan exception, deferring to the postconviction court's finding that because such attempts were made after the defendant's trial and sentencing, no actual conflict of interest adversely affected counsel's representation. Brown, 894 So.2d at 158.
Recently, the supreme court reiterated the rules of law it applies when considering an ineffective assistance of counsel claim based upon an alleged conflict of interest.
Initially, we acknowledge that the right to effective assistance of counsel encompasses the right to representation free from actual conflict. See Strickland, 466 U.S. at 688, 104 S.Ct. 2052; Cuyler v. Sullivan, 446 U.S. 335, 349, 100 S.Ct. *437 1708, 64 L.Ed.2d 333 (1980). However, in order to establish an ineffectiveness claim premised on an alleged conflict of interest the defendant must "establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 350, 100 S.Ct. 1708; see also Quince v. State, 732 So.2d 1059, 1065 (Fla.1999). A lawyer suffers from an actual conflict of interest when he or she "actively represent[s] conflicting interests." Cuyler, 446 U.S. at 350, 100 S.Ct. 1708. To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised. See Herring v. State, 730 So.2d 1264, 1267 (Fla.1998). A possible, speculative or merely hypothetical conflict is "insufficient to impugn a criminal conviction." Cuyler, 446 U.S. at 350, 100 S.Ct. 1708. "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Id. If a defendant successfully demonstrates the existence of an actual conflict, the defendant must also show that this conflict had an adverse effect upon his lawyer's representation. See Strickland, 466 U.S. at 692, 104 S.Ct. 2052; Cuyler, 446 U.S. at 350, 100 S.Ct. 1708.
The question of whether a defendant's counsel labored under an actual conflict of interest that adversely affected counsel's performance is a mixed question of law and fact. See Cuyler, 446 U.S. at 342, 100 S.Ct. 1708; Quince, 732 So.2d at 1064. Once a defendant satisfies both prongs of the Cuyler test, prejudice is presumed and the defendant is entitled to relief. See Strickland, 466 U.S. at 692, 104 S.Ct. 2052; Cuyler, 446 U.S. at 349-50, 100 S.Ct. 1708.
Bell v. State, 965 So.2d 48, 77-78 (Fla. 2007) (quoting Hunter v. State, 817 So.2d 786, 791-92 (Fla.2002)).
Interestingly, none of these post-2002 Florida Supreme Court cases have even acknowledged Mickens. The Florida Supreme Court has stated that when an ineffective assistance of counsel claim is based on the Sixth Amendment, it is not at liberty to disregard the United States Supreme Court's decision in Strickland. Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999). This language suggests that perhaps the Florida Supreme Court has either overlooked Mickens or simply elected not to address the case until the United States Supreme Court itself gives additional guidance. On the other hand, ineffective assistance claims, such as the ones in this case, may also be based on Article I, Section 16 of the Florida Constitution. See, e.g., McKinney v. State, 579 So.2d 80 (Fla. 1991). Thus, it is possible that the Florida Supreme Court's broad application of the Sullivan exception could be based upon the state constitutional right to effective assistance of counsel, although it has not expressly said so.
Whatever the basis for our supreme court's failure to address Mickens, because we are bound by its decisions, and because it continues to apply Sullivan to all types of conflict cases, we believe that we must address Mr. Alessi's conflict claims under the Sullivan exception.
2. The Burnside and Cole Tests For Applying Sullivan.
Mr. Alessi urges us to apply Sullivan using a two-part "viable alternative" test recited in Burnside, which we borrowed from a federal First Circuit case, United States v. Fahey, 769 F.2d 829 (1st Cir. 1985). Under this test, to prevail on an ineffective assistance of counsel (conflict of interest) claim, a defendant must first *438 show that "some plausible alternative defense strategy or tactic might have been pursued." Burnside, 656 So.2d at 244 (quoting Fahey, 769 F.2d at 835). Second, the defendant must "establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" Id. (emphasis added). With respect to the first part of this test, the defendant "need not show that [he] would necessarily have been successful if [the alternative strategy] had been used, but that it possessed sufficient substance to be a viable alternative." Id. With respect to the second part of the test, the conjunctive "or" appears to relieve the defendant of any burden to demonstrate that the conflict actually affected counsel's representation.
Applying this test to Mr. Alessi's financial conflict claim, for example, Mr. Alessi clearly demonstrated a viable alternative defense strategy (use of an expert to address areas of weakness in his defense). And, the trial court's finding that Mr. Johnson's decision to forego an expert was not affected by this financial conflict would be irrelevant under the express language of the two-part viable alternative test because Mr. Alessi would only have to demonstrate that the strategy of hiring an expert was inherently in conflict with Mr. Johnson's "other loyalties," i.e., his financial self-interest. That conclusion is obvious. Therefore, Mr. Alessi would be entitled to relief on his financial conflict claim under a literal reading of the two-part viable alternative test recited in Burnside. However, because the trial court's finding on this issue (that counsel's decision to forego an expert was unaffected by the fee arrangement) is supported by competent and substantial evidence, Mr. Alessi would not be entitled to relief under a test requiring him to show a causal link between the conflict and counsel's performance.
A literal application of the test from Burnside clearly conflicts with this court's decision in Cole. In Cole, we affirmed the denial of a motion for postconviction relief alleging a financial conflict between the interests of a defendant and his lawyer. The attorney in Cole had entered a retainer agreement providing that all deposition costs would come from his fee, and then deposed no witnesses. Based upon the trial court's finding that the attorneys' decision to forego depositions was unaffected by the fee arrangement, our court affirmed the denial order. Of course, in that case, the defendant had established a viable alternative defense strategy (deposing witnesses in preparation for trial), that was inherently in conflict with counsel's financial self-interest. Therefore, if this court had applied the two-part viable alternative test recited in Burnside, ad litteram (i.e., to the letter, or precisely), it would have reversed the denial order, and required a new trial in Cole.
Although the parties failed to fully brief this issue as well, our own research has revealed no Florida state court opinion other than Burnside that has ever even referred to the "viable alternative" test when applying the Sullivan exception. Additionally, our research has revealed that although the two-part viable alternative test appears to be used in the federal First, Second, Third and Ninth Circuits, See, e.g., Hovey v. Ayers, 458 F.3d 892, 908 (9th Cir.2006); United States v. Soldevila-Lopez, 17 F.3d 480, 486 (1st Cir.1994); Winkler v. Keane, 7 F.3d 304, 309 (2d Cir.1993); United States v. Gambino, 864 F.2d 1064, 1070 (3d Cir.1988), it has been rejected by the Fourth, Eighth and Eleventh circuits courts in favor of a three-part test that expressly requires a defendant to demonstrate "a link between the actual conflict and the decision to forgo the alternative strategy of defense." Pegg v. U.S., 253 F.3d 1274, 1278 (11th Cir.2001). See *439 also Winfield v. Roper, 460 F.3d 1026, 1039 (8th Cir.2006); Mickens v. Taylor, 240 F.3d 348, 361 (4th Cir.2001) (en banc), aff'd, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). The Fifth Circuit's formulation is even more succinct, requiring proof that "some plausible alternative defense strategy or tactic could have been pursued, but it was not because of the actual conflict." U.S. v. Infante, 404 F.3d 376, 393 (5th Cir.2005) (emphasis added).
In expressly rejecting the argument that a defendant need not prove a causal link between the conflict and counsel's performance, the Fourth Circuit in Mickens cogently pointed out that any standard which relieves a defendant of establishing this causal connection would be patently inconsistent with the United States Supreme Court's analysis in Sullivan itself:

Mickens challenges this standard, arguing that neither this circuit nor the Supreme Court has required a petitioner to establish a link between an adverse effect and an actual conflict. Such a link is implicit, however, in the Supreme Court's requirement that a petitioner show that "his counsel actively represented conflicting interests" and "that a conflict of interest actually affected the adequacy of his representation." Sullivan, 446 U.S. at 350, 349, 100 S.Ct. 1708.
Mickens, 240 F.3d at 361. We agree with the Fourth Circuit's analysis. More importantly, in affirming the Fourth Circuit in Mickens, the United States Supreme Court made clear that "the Sullivan standard . . . requires proof of effect upon representation" and that only "once such effect is shown" is prejudice presumed. 535 U.S at 173, 122 S.Ct. 1237.
The United States Supreme Court's affirmance in Mickens leaves no room for debate on this issue. In light of the clear requirement that defendant show both that his or her counsel; (1) actively represented conflicting interests; and (2) that this adversely affected counsel's performance, we conclude that the two-part viable alternative test, literally read, simply misstates the law.
Finally, we note that Burnside appears to conflict with Florida Supreme Court precedent. Although our supreme court has never expressly discussed the patently different tests used by varying federal circuits on this issue, it has affirmed lower court decisions denying postconviction relief based upon a finding of no causal link between the conflict and the attorney's conduct. See, e.g., Brown v. State, 894 So.2d 137 (Fla.2005); Wright v. State, 857 So.2d 861 (Fla.2003). And, our supreme court has consistently stated that relief in conflict cases is only warranted when defendant establishes that "counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." Wright, 857 So.2d at 871-72 (emphasis added).
For these reasons, we believe Burnside's reliance on the two-part viable alternative test to be an aberration in Florida law, and we reject Mr. Alessi's invitation to apply the test here. Cole properly applied Sullivan.
3. Applying Sullivan To Mr. Alessi's Claims.
As already noted, the trial court's finding that Mr. Johnson's financial conflict did not adversely affect his performance is supported by competent and substantial evidence. This finding precludes relief on Mr. Alessi's financial conflict claim. Mickens, 535 U.S at 173, 122 S.Ct. 1237.[4]
With respect to the other Sullivan claim, we find that Mr. Alessi is entitled to *440 relief. The record is clear that Mr. Johnson made himself a potential witness in the case through his advice and actions regarding the murder weapon. This potential conflict fully matured into an active conflict when the State began questioning Mr. Alessi regarding his concealment and delay in disclosing the murder weapon at trial. This active conflict adversely affected Mr. Johnson's performance when he prevented Mr. Alessi from fully explaining Mr. Johnson's advice and actions to the jury, in an attempt to protect his role as counsel by precluding inquiry into an area that would highlight his conflicting role as a witness.[5] Because Mr. Alessi has established that his attorney was laboring under an active conflict of interest that adversely affected his performance at trial, we find that relief should have been granted as to this claim.
Finally, we have not overlooked the State's argument that Mr. Alessi waived any potential conflict at trial. We understand that criminal defendants are entitled to waive their right to conflict-free counsel. See Larzelere v. State, 676 So.2d 394, 403 (Fla.1996). Generally, a waiver of this right must be shown by "clear, unequivocal, and unambiguous language." United States v. Rodriguez, 982 F.2d 474, 477 (11th Cir.1993), cert. denied, 510 U.S. 901, 114 S.Ct. 275, 126 L.Ed.2d 226 (1993); see also Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Additionally, "[f]or a waiver to be valid, the record must show that the defendant was aware of the conflict of interest, that the defendant realized the conflict could affect the defense, and that the defendant knew of the right to obtain other counsel." Larzelere, 676 So.2d at 403. The trial judge, however, did not find that Mr. Alessi waived his right to conflict-free counsel as to this issue. Also, contrary to the State's argument, the record does not show that Mr. Alessi made a valid waiver *441 by clear, unequivocal, and unambiguous language.

Conclusion
For the reasons explained in this opinion, we reverse the trial court's denial of Mr. Alessi's postconviction motion as to Mr. Alessi's conflict claim regarding his lawyer as a witness, only, and remand with instructions that Mr. Alessi be granted a new trial.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR NEW TRIAL.
PLEUS, J., and REINMAN, M., Associate Judge, concur.
NOTES
[1] According to Johnson's testimony at the evidentiary hearing on Mr. Alessi's postconviction motion, his co-counsel wanted to get an opinion from the Florida Bar before turning over the gun. After they had an opinion saying it was okay to turn over the gun, they did so. Mr. Johnson also explained that the State was not in any particular hurry to get the gun. Mr. Johnson said that he told the lead prosecutor that the gun would be turned over, and that neither he nor the prosecutor had any sense of urgency because neither saw the gun as that important in light of the fact that Mr. Alessi had conclusively been identified as the shooter by multiple eyewitnesses and his own confession.
[2] We note that determining whether a subject is appropriate for opinion testimony is a matter left to the trial judge's discretion. See, e.g., Simmons v. State, 934 So.2d 1100, 1117 (Fla.2006). Here, the trial court made no findings on the extent to which this expert's wide-ranging testimony at the evidentiary hearing would have been admitted at trial.
[3] However, some courts discuss Sullivan by reference to the other party's last name, Cuyler.
[4] As we did in Cole, however, we once again note that attorneys have an ethical obligation under Rule 4-1.7 of the Rules of Professional Conduct to avoid representing any client under circumstances that would compromise the lawyer's exercise of independent professional judgment. That rule expressly provides that a lawyer "shall not represent a client if the lawyer's exercise of independent professional judgment in the representation of that client may be materially limited by the lawyer's . . . own interest," without client consent after consultation. The types of fee arrangements employed in this case, and in Cole, are so susceptible to claims of conflict and questions regarding the ethics of the attorney's strategic decisions at odds with his or her own financial interests that an attorney should probably expect an ethics inquiry by the Florida Bar with respect to any case for which this type of fee arrangement is used. In fact, this type of fee arrangement is so obviously prone to allegations of ethical lapse that the supreme court may want to consider barring it altogether in criminal cases.
[5] The State concedes in its brief that Mr. Johnson's objections at trial were prompted because inquiry into the topic "was causing him [Johnson] to become a witness," and because Johnson was "outraged the prosecutor was implying he had hid the gun when he had previously informed them within 3-4 weeks that they had it." As Mr. Johnson explained to the trial court, he felt that if the State intended to pursue an issue that would thrust him into the role of witness, thereby creating a conflict between him and his client, it should have notified him of that intent months before trial. This was part of Mr. Johnson's argument, at trial, in support of his position that Mr. Alessi should not be allowed to answer the question that would further reveal Mr. Johnson's responsibility for the delayed disclosure. We agree with Mr. Johnson that, at least as a matter of courtesy, the State should have notified Mr. Johnson of its intent to pursue this inquiry prior to trial. By failing to do so, and then pursuing the matter at trial even when the prosecutor knew such inquiry would implicate Johnson as a witness on this issue, the State itself unwittingly created the active conflict of interest that, ironically, will entitle Mr. Alessi to a new trial.