894 So.2d 137 (2004)
George Wallace BROWN, Appellant,
v.
STATE of Florida, Appellee.
George Wallace Brown, Petitioner,
v.
James V. Crosby, Jr., Respondent.
Nos. SC02-1787, SC03-1240.
Supreme Court of Florida.
December 2, 2004.
Rehearing Denied January 25, 2005.
*142 Mary Catherine Bonner, Fort Lauderdale, FL, for Appellant/Petitioner.
*143 Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
George Wallace Brown appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and petitions for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. As explained below, we affirm the trial court's denial of postconviction relief and deny the claims in Brown's habeas petition.

I. FACTUAL AND PROCEDURAL BACKGROUND
The facts of Brown's case were articulated in this Court's opinion on direct appeal. See Brown v. State, 644 So.2d 52, 52-53 (Fla.1994). We briefly repeat them here. When Brown was arrested on an unrelated warrant in Englewood, Colorado, on May 1, 1990, he had in his possession two wallets, his own and one containing credit cards in the name of Horace Brown. He told a detective that "Horace D. Brown is dead. He was murdered eight days ago." He added quickly, "No, no, I didn't do it, but I was the only one that was a witness to it." Brown said he wanted to talk to an investigator. Later that evening, after being told of his rights and signing a waiver, Brown gave an account of the crime.
According to Brown, he met Horace at a bar called Sam's in an unspecified location, and after drinking with him asked Horace if he would drive him to his girlfriend's in Polk City, Florida. On the way, Horace drove onto a dirt road and met a friend named Danny in another car. While Horace was in Danny's car, Brown left in Horace's car, drove to his girlfriend's, and returned an hour later. He found Horace's wallet, watch, and papers on the ground where Danny's car had been, and then after driving down the road found Horace's body. The body was about twenty-five feet off the road, lying feet first on its stomach in weeds. The body was bloody. When Brown could find no pulse, he got scared and left. He did not go to the police because he had outstanding warrants and was afraid he would be charged with the killing. Brown drove to Orlando, cashed a check from Horace's checkbook for $650, bought a car, and drove to Nashville. Two days later, he left Nashville and drove to Colorado, where he was arrested.
Based on Brown's statement, Colorado police contacted Polk County Sheriff's deputies, who located Horace's decomposing body in a ditch where Brown said it would be and in the posture he had described. Horace had been stabbed three times. A detective from the Polk County Sheriff's Office flew to Colorado and interviewed Brown. Brown gave roughly the same account. His girlfriend, Judy, later told police that he had left her house on foot in the early evening on the night of the killing, and had returned later that night driving a car she had not seen before. On returning, he had blood on his clothes and told her he had been in a fight. She noticed that a pocket knife she normally kept on her nightstand was missing. He packed his belongings and left that night.
Brown was charged with, and convicted of, first-degree murder and armed robbery. He was sentenced to life on the robbery count and, consistent with the jury's eight-to-four vote, death on the murder count. The judge found three aggravating and no mitigating circumstances.[1] *144 Brown appealed his convictions and sentences, raising fourteen issues.[2] This Court affirmed Brown's conviction and sentence. Brown, 644 So.2d at 54.
Brown filed a Motion to Vacate Judgment of Conviction and Sentence with Special Request for Leave to Amend, which he later amended. The trial court held a hearing pursuant to Huff v. State, 622 So.2d 982 (Fla.1993). The trial court decided to hold an evidentiary hearing on the motion's first five claims.[3] The court summarily denied the remaining claims, concluding that they were either procedurally barred, conclusively refuted by the record, or legally insufficient. See Maharaj v. State, 684 So.2d 726, 728 (Fla.1996); Holland v. State, 503 So.2d 1250, 1251 (Fla.1987). After the evidentiary hearing, the trial court denied relief on the remaining claims.

II. POSTCONVICTION CLAIMS
This Court has repeatedly held that to establish a claim of ineffective assistance of counsel, a defendant must prove two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Valle v. State, 778 So.2d 960, 965 (Fla.2001) (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). In Valle, this Court explained further:
In evaluating whether an attorney's conduct is deficient, "there is `a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,'" and the defendant *145 "bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." This Court has held that defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected. Moreover, "[t]o establish prejudice [a defendant] `must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"
Id. (quoting Brown v. State, 755 So.2d 616, 628 (Fla.2000), and Williams v. Taylor, 529 U.S. 362, 394, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).
Brown raises six issues on appeal from denial of postconviction relief. We affirm the trial court's summary denial of several claims. We agree that such claims were either procedurally barred, conclusively refuted by the record, or legally insufficient.[4] We discuss the remaining five issues relating to Brown's motion for postconviction relief: (1) Brown's claim that trial counsel rendered ineffective assistance of counsel for failing to investigate mitigation evidence at the guilt and penalty phases; (2) Brown's waiver of his right to be present at the evidentiary hearing; (3) the denial of Brown's request for supplemental argument after the close of the evidentiary hearing; (4) trial counsel's alleged conflict of interest in connection with the alleged improper sharing of information between the defense and the prosecution and the allegation that trial counsel's legal assistant had an affair with the lead detective; and (5) trial counsel's alleged conflict of interest arising from his alleged effort to improperly obtain intellectual property rights in Brown's life story, recordings, songs, and poetry.

*146 A. Counsel's Alleged Ineffectiveness for Failing to Investigate Mitigation
Brown first alleges that during the guilt phase, trial counsel was ineffective for failing to present an intoxication defense and for failing to introduce evidence that this might have been a sex crime. These claims lack merit. As trial counsel testified at the evidentiary hearing, an intoxication defense would have been inconsistent with Brown's claims of innocence. Failure to present an intoxication defense cannot constitute ineffective assistance of counsel when the defendant asserts his innocence. See Rivera v. State, 717 So.2d 477, 485 (Fla.1998); Remeta v. Dugger, 622 So.2d 452, 455 (Fla.1993); cf. Rose v. State, 617 So.2d 291, 294 (Fla.1993) ("When a defendant preempts his attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made.") (quoting Mitchell v. Kemp, 762 F.2d 886, 889 (11th Cir.1985)).
Counsel's decision not to present evidence that this might have been a sex crime was consistent with Brown's instructions. Counsel contemplated this line of evidence and discussed it with the defendant. Brown specifically rejected this defense because it might suggest that he was a homosexual and that the victim was as well. Brown did not want to subject the victim's wife to this sort of evidence. An attorney will not be deemed ineffective for honoring his client's wishes. See Waterhouse v. State, 792 So.2d 1176, 1183 (Fla.2001) (holding that counsel was not ineffective for failing to present certain mitigation evidence where the client instructed him not to pursue that evidence); Sims v. State, 602 So.2d 1253, 1257-58 (Fla.1992) ("[W]e do not believe counsel can be considered ineffective for honoring the client's wishes.").
Brown alleges that trial counsel was ineffective for failing to present and investigate mitigation evidence. When evaluating counsel's alleged deficiency "courts are required to . . . make every effort to eliminate the distorting effects of hindsight by evaluating the performance from counsel's perspective at the time." Blanco v. Wainwright, 507 So.2d 1377, 1381 (Fla.1987). Moreover, "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Cherry v. State, 781 So.2d 1040, 1050 (Fla.2000) (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052). Trial counsel did concede that if he could have presented more mitigation evidence, the jury might not have recommended death. However, counsel's ability to present sufficient mitigation was limited by the defendant's desire not to involve his family. At the penalty phase, trial counsel presented Dr. Dee's testimony and the testimony of the defendant's mother. This took place after trial counsel convinced Brown to reevaluate his initial decision not to present any penalty phase evidence. Trial counsel's inability to present further mitigation cannot be considered ineffective in light of Brown's limitations on counsel's penalty phase investigation.
Brown also alleges that trial counsel was ineffective at the penalty phase for failing to pursue "dozens of investigative leads" contained in various medical records that diagnosed the defendant as schizophrenic and epileptic. Counsel was aware that Brown's medical records contained these diagnoses. These records were from two separate mental health centers that treated the defendant. The records contained statements that the defendant had a great propensity for violence, which concerned trial counsel. He noted that this language would have been *147 helpful for the prosecution and damaging to the defendant's penalty phase efforts. After evaluating the records, trial counsel made a conscious decision to avoid this negative language by asking Dr. Dee questions that would elicit the documents' helpful content but not their damaging aspects. See Cherry, 781 So.2d at 1049-50 (upholding trial counsel's strategic decision to admit expert's report into evidence rather than call him as a witness at the penalty phase because it eliminated the State's ability to cross-examine the facts in the report). Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct. See Rutherford v. State, 727 So.2d 216, 223 (Fla.1998); State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987); Kenon v. State, 855 So.2d 654, 656 (Fla. 1st DCA 2003) (citing Maharaj v. State, 778 So.2d 944 (Fla.2000)).
Brown also attacks trial counsel's decision to present only Dr. Dee and the defendant's mother at the penalty phase.[5] During his penalty phase testimony, Dr. Dee admitted he was relying on information Brown had provided and had few independent sources for his assessments other than the medical records and Dr. Garcia's records.[6] Dr. Dee also testified that Brown was an alcoholic, had an IQ of 117, had impaired memory function consistent with brain damage, and had organic personality syndrome and organic brain syndrome. He also noted Dr. Garcia's diagnosis that Brown was an epileptic. Thus, this does not appear to be a psychiatric evaluation "so grossly insufficient that [it] ignore[s] clear indications of either mental retardation or organic brain damage," thereby warranting a new sentencing hearing. State v. Sireci, 502 So.2d 1221, 1224 (Fla.1987).
Nonetheless, Brown claims that if counsel had properly investigated, he would have encountered other witnesses who could have testified about Brown's character and troubled background and that these independent sources could have verified Brown's statements to Dr. Dee, thereby enhancing the credibility of Dr. Dee's testimony. Brown argues that this enhanced credibility would have changed the outcome of the penalty phase because it could have convinced the jury that mitigation was appropriate. As stated above, the shortcomings of the penalty phase arose mainly from Brown's strict instructions to counsel not to speak to family members other than his mother. This lack of cooperation at the penalty phase undermines Brown's present allegations of ineffective assistance of counsel. See Cherry, 781 So.2d at 1052 (finding that while counsel appeared to give mental health expert insufficient information upon which to base an evaluation, there was no deficiency given that lack of information was due to defendant's lack of cooperation); Sims v. State, 602 So.2d 1253, 1257 (Fla.1992).
*148 Moreover, even if there was some deficiency, there is no prejudice because the additional testimony presented at the evidentiary hearing contributes virtually no new information and is merely cumulative to the testimony presented at trial. See Gudinas v. State, 816 So.2d 1095, 1106 (Fla.2002) (finding that trial counsel was not ineffective for failing to present evidence in mitigation that was cumulative to evidence already presented). Much of this testimony simply corroborated the background information presented at the penalty phase through Brown's mother and Dr. Dee. See Cherry, 781 So.2d at 1051 ("[E]ven if trial counsel should have presented witnesses to testify about Cherry's abusive background, most of the testimony now offered by Cherry is cumulative. . . . Although witnesses provided specific instances of abuse, such evidence merely would have lent further support to the conclusion that Cherry was abused by his father, a fact already known to the jury.").
At the penalty phase, Brown's mother testified that his father kidnapped him and his siblings; that Brown ran away as a child at least once; that Brown's father was "capable of doing serious bodily damage" and that he was an alcoholic; that Brown's father forced Brown and his siblings to work in the fields as migrant workers when they were children; that Brown's father would beat them and prevent them from going to school; that Brown's father tried to sexually abuse Brown's sister; that Brown protected his sister, Anita, from their father's physical abuse; and that Brown's father shot him in the head with a.22 caliber rifle.
At the evidentiary hearing, Brown's sister testified that Brown protected her and the other siblings from their father's physical abuse; that Brown's father was sexually and physically abusive toward his daughters and possibly his sons as well; that the father once pulled a switchblade on Brown; and that Brown's father shot him in the head. The remaining non-expert witnesses testified about Brown's interaction with his stepchildren and his musical abilities.[7]
At the evidentiary hearing Brown also presented the testimony of Dr. Pinero, but that testimony was essentially cumulative as well. Dr. Pinero did not examine or meet with Brown and used the same data available to counsel and Dr. Dee. The only notable difference between Dr. Pinero's testimony and Dr. Dee's is that Dr. Pinero spent more time discussing the severity of Brown's epilepsy, which he attributed to significant head trauma. Dr. Dee also testified about Brown's head trauma, but did not draw its connection to epilepsy. While there might be differences between these experts' testimony, that does not necessarily warrant relief. See Cherry, 781 So.2d at 1052 (stating that relief was not warranted even though the new expert reached different conclusions from those of the prior expert); Rose v. State, 617 So.2d 291, 295 (Fla.1993) (stating that the fact that defendant obtained a mental health expert whose diagnosis differed from that of the defense's trial expert did not establish that the original evaluation was insufficient).
Finally, Brown argues that trial counsel's motion for attorney's fees indicates that he did not spend enough time on *149 penalty phase preparation and that any waiver of mitigation evidence was not knowing and intelligent. Specifically, Brown argues that one cannot waive meaningful mitigation until his lawyer tells him what the investigation has uncovered and what sort of impact the evidence will have on the jury. Brown also argues that this waiver should be the subject of clear and unequivocal discussion between the defendant and the judge. Brown cites no authority for such a rule, but appears to argue for the retroactive application and extension of Koon v. Dugger, 619 So.2d 246 (Fla.1993), which held:
When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.
Id. at 250. In Koon, however, we clearly stated that this rule was prospective, thereby precluding its application here. Id. Moreover, in this case Brown did not seek to waive all mitigation evidence. Rather, he simply sought to limit trial counsel's access to certain types of mitigation evidence by limiting his contact with his family members. Cf. Gore v. State, 784 So.2d 418, 438 (Fla.2001) (finding no ineffective assistance where counsel acted reasonably in seeking out and evaluating potential mitigating evidence and the defendant himself thwarted counsel's efforts to secure mitigating evidence by refusing to cooperate with mental health experts).
Regarding counsel's preparation for the penalty phase, Brown relies on State v. Lewis, 838 So.2d 1102 (Fla.2002), where we upheld a trial court's finding that counsel inadequately prepared for the penalty phase and rendered ineffective assistance. Id. at 1108. However, that case also stated that "the finding as to whether counsel was adequately prepared does not revolve solely around the amount of time counsel spends on the case or the number of days which he or she spends preparing for mitigation" and that it is a "case-by-case analysis." Id. at 1113 n. 9.[8] The Court looks at a variety of factors, including the actual penalty phase and trial counsel's capital case experience. See Rose v. State, 675 So.2d 567, 573 (Fla.1996) (finding that although counsel had 79 days to prepare for a resentencing, this was not sufficient time, in part because counsel had never tried a capital case before).
Trial counsel's experience in capital cases consisted of handling some death penalty appeals and several first-degree murder cases. Some of these murder cases were initially classified as death penalty cases, but the State ultimately decided not to pursue the death penalty. While this was the first time counsel had participated in a penalty phase proceeding, appellant has failed to demonstrate counsel's ineffectiveness.
Contrary to the dissent's assertions, this case is not analogous to Lewis and does not warrant a new penalty phase. A comparison with Lewis is, however, instructive. In Lewis, counsel never sought out the *150 defendant's background records, including hospitalization records, and never interviewed members of defendant's family. As a result, a significant amount of important mitigation evidence never reached the jury.[9] In this case, on the other hand, much of the information that was not presented in Lewis was presented to the jury when Brown's mother testified at the penalty phase.[10] At the penalty phase, Brown's mother testified that Brown's father kidnapped him and his siblings; that Brown ran away as a child at least once; that Brown's father was "capable of doing serious bodily damage" and that he was an alcoholic; that Brown's father forced Brown and his siblings to work in the fields as migrant workers when they were children; that Brown's father would beat them and prevent them from going to school; that Brown's father tried to sexually abuse his sister; that Brown protected his sister, Anita, from their father's physical abuse; and that Brown's father shot him in the head with a .22 caliber rifle.
Moreover, counsel obtained the defendant's mental health records and was aware of their content. For strategic reasons, he attempted to introduce the substance of these documents through the testimony of Dr. Dee. In Lewis, trial counsel waited more than two weeks after the guilty verdict before he requested the trial court to appoint the mental health expert. Here, trial counsel's motion for reimbursement of costs indicates that he was in contact with Dr. Dee before the guilt phase ended. Moreover, he obtained copies of Brown's medical records before the penalty phase. Counsel also obtained valuable information about the defendant's background after he assumed responsibility for the case and reviewed the documents provided by the public defender's office, which represented Brown for several months before trial counsel inherited the case.
The fact that other witnesses would have simply corroborated the basis underlying Dr. Dee's opinions and testimony does not mean that trial counsel's performance was deficient. See Valle v. State, 705 So.2d 1331, 1334 (Fla.1997) (rejecting the argument that counsel was ineffective for failing to call defendant's mother and former wife, who could have buttressed the *151 expert's testimony regarding defendant's background because it would have been cumulative); Koon, 619 So.2d at 250 (holding that trial counsel's penalty phase performance was not ineffective where he investigated potential mitigation evidence before trial, knew about defendant's background, reviewed psychiatric reports, and talked to a mental health expert about penalty phase issues). Thus, Brown has failed to show that trial counsel was ineffective.

B. Brown's Decision to Waive His Presence at the Evidentiary Hearing
Brown next challenges the adequacy of Brown's waiver of his right to appear during the evidentiary hearing. At the end of the evidentiary hearing's second day, the following discussion occurred:
THE DEFENDANT: Your Honor, may I just for a second, they're talking about another hearing. I would formally like to waive my presence at the next hearing. . . . I don't want to come back for the next hearing for medical reasons and stuff. So they can handle it.
THE COURT: So you don't want to testify either? Is that what you're saying?
THE DEFENDANT: Not if it's going to  no, no, I was going to do it today, but they decided to wait until the next hearing, and I don't want to come back for another hearing....
THE COURT: Wait. I have to get this straight now. That if you decline  first, you understand that you have the right to testify?
THE DEFENDANT: Yes, I do.
THE COURT: And if you're declining to testify, that has to be your decision, not somebody else's.
THE DEFENDANT: I understand that.
THE COURT: Is it your decision?
THE DEFENDANT: Well, let me  see . . . I don't want to come back for another hearing, and so I'm just going to decline to testify period, okay? So 
Postconviction counsel then told the court that he wanted Brown to testify last and the court stated:
THE COURT: But he doesn't want to be here. So you can't do that because he's not coming.
MR. BRODY: Well, I don't 
THE COURT: If he doesn't want to come, he doesn't have to. He has the right 
MR. BRODY: I understand that . . . these decisions are made and unmade, and I think it would be better at that time to make that determination. . . .
. . . .
THE COURT: We'll let the record reflect that if that changes between now and then, then so be it, but I just want to make sure that for whatever reason, reasons of convenience or comfort or whatever, you're deciding not to testify, right?
. . . .
THE DEFENDANT: And so they tell me, well, you need to come down there and testify.... I extended myself trying to get along, trying to get this over with. Now I'm here and they said they want me to come back because these other witnesses can't show up, and it's always tomorrow, tomorrow with these people. So I'm not going to testify period.
THE COURT: Okay. Let me tell you something. The reason you're here this time is because you have to be, okay? The law says you have to be, and if you're not here, it can only be if you make a waiver in front of a judge. . . .
. . . .

*152 THE COURT: Now, you're here. Now you can talk to me. Now you can waive an appearance, okay, and that's fine, too, if you're telling me you don't want to be here at some subsequent hearing, we'll let that be on the record right now, and if you don't come at the next hearing, I and the Supreme Court will both understand why you didn't, okay.
THE DEFENDANT: . . . [I]f they want me to testify, I would say they better get me up there today because if they don't, I'm leaving.
THE COURT: Okay.
When the prosecutor indicated that appellant could go ahead and testify that afternoon, Brown responded:
THE DEFENDANT: I just said I was waiving. Can't you understand this, Ms. [sic] Aguero?
THE COURT: You are not testifying?
THE DEFENDANT: I am not coming back to testify. They say I can't testify because they got these other witnesses to put on, and they don't want me to testify until these other witnesses are put on, and I am saying I am not making this trip again.
The appellant then stated:
THE DEFENDANT: Your Honor, between  let's put this in abeyance. I need to really discuss  they have these other witnesses they want to put on the record. At some point between now and whenever they have this other witness, let's decide  let me decide then, okay?
THE COURT: Okay.
THE DEFENDANT: Okay. Thank you, Your Honor.
THE COURT: Court's adjourned.
On November 20, 2000, Brown filed the following waiver with the trial court:
I, GEORGE WALLACE BROWN, having been fully advised of my right to appear at and testify in my evidentiary hearing, hereby waive appearance at the December 15, 2000 hearing. I understand that by not appearing and providing testimony, I may fail to present evidence on claims for which I have been granted a hearing but knowingly waive appearance and the possible presentation of my own testimony.
At the subsequent December 15 hearing the following exchange occurred:
THE COURT: Thank you. Okay. Mr. Brody, why don't you state for the record why your client isn't here.
MR. AGUERO: He signed a waiver. We advised him of the ups and downs and pros and cons of that, and he did not want to come.
THE COURT: Okay. And do you have anything else?
MR. BRODY: No, Your Honor. We will have no further evidence other than the introduction of these depositions and reports substantively into evidence.
In the end, it appears that the court discussed the waiver with Brown during the second day of the evidentiary hearing, but he did not actually waive at that hearing. Instead, he waived his presence when he filed the written waiver.
Brown now argues that his presence was required. He cites to Florida Rule of Criminal Procedure 3.851(c)(3), which states that a prisoner's presence is required "at the evidentiary hearing on the merits of any claim." However, rule 3.851(c)(3) does not apply to Brown because his amended postconviction motion was filed on December 2, 1999. See Fla. R.Crim. P. 3.851 (stating that the rule shall apply to all postconviction motions filed on or after October 1, 2001). Rule 3.850(e), which does apply to Brown, states that "[a] court may entertain and determine the motion without requiring the production of the movant at the hearing." *153 Thus, Brown's argument has no merit. See Clark v. State, 491 So.2d 545, 546 (Fla.1986) (stating that whether a prisoner should be physically present at a 3.850 hearing is discretionary with the trial court except when evidence is to be presented and the prisoner is not represented by counsel); Neal v. State, 636 So.2d 197 (Fla. 4th DCA 1994) (rejecting an argument that the trial court erred when it failed to require the movant's presence at the hearing on his motion for postconviction relief, citing rule 3.850(e)). If the court can adjudicate the postconviction motion's claims without the defendant's presence, it follows that a waiver of appearance is not required.
Finally, to the extent that Brown's argument involves the waiver of testimony, and not just appearance, his argument also fails. In the context of discussing the waiver of defendant's right to testify during his capital trial, this Court has repeatedly refused to require an on-the-record waiver. See Lawrence v. State, 831 So.2d 121, 132 (Fla.2002) (rejecting defendant's argument that counsel should have obtained a waiver of his right to testify on the record to ensure that the waiver was knowing and intelligent and stating that due process does not require that the defendant waive his right to testify on the record); Torres-Arboledo v. State, 524 So.2d 403, 410-11 (Fla.1988) (holding that although there is a constitutional right to testify under the Due Process Clause of the United States Constitution, "this right does not fall within the category of fundamental rights which must be waived on the record by the defendant himself"). When viewed in this context, the court's discussion with Brown and his subsequent written waiver are more than sufficient. It would also be inconsistent to require an on-the-record waiver for a defendant's evidentiary hearing testimony and not his capital trial testimony. Such a requirement would create an odd jurisprudence where the defendant's right to testify at a postconviction evidentiary hearing is deemed a "fundamental right," but his right to testify at the actual capital trial is viewed as something less.

C. Trial Court's Decision Not to Allow Supplemental Argument
Brown next appeals the denial of his request for supplemental argument. After the evidentiary hearing on Brown's motion for postconviction relief, Brown's postconviction counsel, who had represented him at the evidentiary hearing, left the Capital Collateral Regional Counsel ("CCRC"). Brown's new counsel, Mr. Gruber, also of the CCRC, filed a Motion to Hold Ruling in Abeyance, which argued that "a motion to reopen the evidentiary hearing in this case for any reason might be predicated by an allegation of ineffective assistance of postconviction counsel."[11] The motion asserted that the new counsel "may find additional evidence" that might be relevant. In addition, the motion alleged that "Mr. Brown may wish to offer testimony" and that his testimony "would necessarily have a substantial impact on any analysis of the case." In light of Brown's waiver of his right to testify at the evidentiary hearing, we hold that the trial court did not abuse its discretion in denying the motion. Cf. Donaldson v. State, 722 So.2d 177, 182 (Fla.1998) (holding that *154 trial court did not abuse its discretion in refusing to reopen the case to allow the defendant's testimony where the defendant asserted his desire to testify after initially explicitly refusing to do so, and after the close of all the evidence and the completion of closing by both sides). Moreover, counsel's allegation that the defense might find additional evidence is facially insufficient to support the motion.
Finally, to the extent that new counsel's motion argued that former counsel's ineffectiveness led to deficiencies in the evidentiary hearing, the argument is meritless. See Spencer v. State, 842 So.2d 52, 72 (Fla.2003) (holding that the lower court properly concluded that the appellant's claim of ineffective assistance of postconviction counsel was not properly cognizable in a rule 3.850 motion); Lambrix v. State, 698 So.2d 247, 248 (Fla.1996) (holding that claims of ineffective assistance of postconviction counsel do not present a valid basis for relief).
The trial court was also correct in denying counsel's Motion to Accept Supplemental Argument and Permit Supplemental Oral Argument. While case law is scant regarding a motion for supplemental argument after a postconviction evidentiary hearing has closed, matters regarding the length of legal argument and the length of a proceeding generally fall within a trial court's discretion. See May v. State, 89 Fla. 78, 103 So. 115, 116 (1925) ("[T]he limitation of the time for argument must of necessity, within reasonable bounds, rest in the discretion of the trial court.... No hard and fast rule can be prescribed."); 75A Am.Jur.2d Trial § 547 (1991) ("The time allowed counsel for argument is within the sound discretion of the trial court."); cf. Jones v. State, 745 So.2d 1121, 1122 (Fla. 5th DCA 1999) (stating that whether a defendant should be permitted to reopen his case is a matter within the sound discretion of the trial court); Buckhalt v. McGhee, 632 So.2d 120, 121 (Fla. 1st DCA 1994) (stating generally that "the length of time set aside by the court for a hearing is generally a matter left to the discretion of the trial court").
The motion sought to supplement the record with further closing remarks as well as additional legal argument regarding evidence introduced at the hearing. Cf. Rose v. State, 472 So.2d 1155, 1158 (Fla.1985) (holding that the trial court did not abuse its discretion in denying a request to reopen the case so that the defendant could retake the stand to clarify and supplement his testimony before closing arguments). It also sought to make new ineffective assistance of counsel arguments without having sought leave to amend the postconviction motion. For example, new counsel made the new argument that trial counsel was ineffective for failing to challenge numerous credit card transactions introduced into evidence. In short, the motion attempted to make arguments that the new postconviction counsel believed prior counsel should have made. The trial court did not abuse its discretion in denying the motion. See Thompson v. State, 759 So.2d 650, 668 n. 12 (Fla.2000) (finding a claim procedurally barred because it was not alleged in the postconviction motion filed in the trial court).

D. Improper Sharing of Information
Brown next argues that the trial court should have granted postconviction relief because of his trial counsel's alleged conflict of interest concerning the alleged improper sharing of information between the defense and the prosecution and the allegation that trial counsel's legal assistant had an affair with the lead detective. In his brief, Brown asserts three instances of ineffective assistance of counsel that were not part of his postconviction motion to the trial court. These include: (1) trial counsel *155 was ineffective for failing to challenge the credit card receipts; (2) trial counsel was ineffective for failing to challenge the handwriting samples' evidentiary chain of custody; and (3) trial counsel was ineffective for failing to challenge the "Bobby-Wanda" note.
While Brown's postconviction motion did argue that the lead detective and defense counsel's legal assistant had an "improper personal relationship" that led to the sharing of "improper information about Mr. Brown's defense," he did not allege any of the specific instances of ineffective assistance of counsel listed above. Rather, the claims alleging improper sharing of information were made to support his broader claim that counsel operated under multiple conflicts of interest. Therefore, these claims are procedurally barred. See Thompson, 759 So.2d at 668 n. 12 (finding a claim procedurally barred because it was not alleged in the postconviction motion filed in the trial court); Finney v. State, 660 So.2d 674, 683 (Fla.1995) (stating that in order to be cognizable on appeal, claims must first be raised in the trial court).
Even if the claims were not procedurally barred, trial counsel's testimony that he did not challenge the samples because they corroborated Brown's story and enhanced his truthfulness constitutes a well-reasoned trial strategy choice. See Kenon, 855 So.2d at 656 ("Absent extraordinary circumstances, strategic or tactical decisions by trial counsel are not grounds for ineffective assistance of counsel claims."). As the trial court noted: "Mr. Brown's story from the very beginning was, `I took the credit cards. I took the checkbook. I took the wallet. I took the car. I went to Orlando. I cashed the check.' Therefore, there was no reason for [trial counsel] to challenge the exemplars or the handwriting expert as it corroborated his story and made it sound like Mr. Brown was telling the truth." Therefore, Brown has not established deficient performance on the part of trial counsel.
Next, as part of his postconviction motion, Brown argued that defense counsel's legal assistant and the lead detective were having an affair. This was argued to support his claim that "trial counsel labored under an actual conflict of interest ... and that, but for this conflict, created by the personal relationship between counsel's assistant and the lead detective, there is a reasonable probability that the outcome of Mr. Brown's trial would be different."
Trial counsel testified that he first became aware of a possible relationship between his assistant and the detective when he saw the detective come by the office, "fairly soon after the trial," to pick up his assistant for lunch. The assistant testified that she first met the detective during Brown's trial and that the extent of their conversation was small talk. She testified that, after the trial, it developed into "a friendship that did have a physical aspect to it" but that it "did not last long and [that] it went back to a friendship." The detective testified that the relationship occurred after the trial and sentencing and that he did not discuss the case with her at any time during the trial. The trial court determined that while there might have been a relationship between the detective and trial counsel's legal assistant, that relationship occurred after the trial ended.
"[A]s long as the trial court's findings are supported by competent, substantial evidence, this Court will not `substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.'" McLin v. State, 827 So.2d 948, 954 n. 4 *156 (Fla.2002) (quoting Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997)). Here, the trial court heard the testimony of all the relevant parties and determined that the affair occurred after the trial and sentencing. Its findings are entitled to deference. See Oats v. Dugger, 638 So.2d 20, 21 (Fla.1994) (upholding the trial court's finding that the defendant was competent despite conflicting expert opinions).
In addition to alleging an affair between the legal assistant and the lead detective, Brown argued that this relationship led to the sharing of improper information between the defense and the State in the form of handwriting samples that the legal assistant apparently had taken. As part of its investigation, the State was trying to compare Brown's handwriting on various check and credit card transactions made in the victim's name. In addition, there was the "Bobby-Wanda" note, which Brown allegedly wrote. That note stated:
Bobby: I'm going to run down to Arab, [Alabama] and see Wanda. I'll call you tonight from there. Also need to take care of something else. I'll be back up by Friday or will send your tag back by then. I appreciate your friendship.
On October 2, 1990, the State filed its motion to compel handwriting samples. The court granted the motion on October 3, and the samples were taken on November 7. Trial counsel testified that the legal assistant was not present at the November 7 meeting. On November 27, the State filed a motion for additional samples of the "Bobby-Wanda" note, arguing that trial counsel was uncooperative during the November 7 meeting and directed his client not to provide some of the requested samples. Trial counsel apparently refused to grant the State's request that Brown write out the contents of the "Bobby-Wanda" note twenty to thirty times. On December 5, the court held a hearing regarding the State's motion for additional samples. At the hearing, trial counsel argued that the request for twenty to thirty handwriting samples of the same note was unreasonable. At the end of the hearing the judge ordered trial counsel to produce approximately ten samples of the note.
According to the detective's report and evidence insert, the additional handwriting samples were collected on January 24, 1991, in the presence of trial counsel at the Polk County Jail. The "Goodwin affidavit" (named after the legal assistant) that both parties discuss is dated the same day. The legal assistant filed an affidavit to obtain handwriting samples. Brown alleges that the language used in the affidavit was similar to language that the lead prosecutor used in a letter to the detective regarding the procedure for obtaining such samples. Brown argued that this similarity evidenced an ongoing relationship between the legal assistant and the detective and that she was trying to assist the prosecution in gathering these samples.
The trial court's order denying the postconviction motion does not mention this similarity but does conclude that the samples the detective obtained were not the same samples the legal assistant collected. The legal assistant testified that she collected these samples pursuant to trial counsel's instructions after the State requested further samples. When asked about the samples the legal assistant obtained, trial counsel testified that he had no independent recollection of the affidavit; however, he stated, "I must have assumed that it was our job at that time [to obtain the writing samples] or [we] agreed to get it done."
The trial court found that only the detective's samples were used at trial and that no improper information was shared. While the legal assistant's testimony was not in complete accord with trial counsel's *157 (trial counsel did not specifically recall instructing the legal assistant to obtain the samples contained in the affidavit) the trial court's determination deserves deference. See Mason v. State, 597 So.2d 776, 779 (Fla.1992) (upholding the trial court's finding that defendant was competent despite conflicting testimony on the issue); cf. Padgett v. State, 780 So.2d 1021, 1022 (Fla. 4th DCA 2001) (holding, despite conflicting testimony at the evidentiary hearing, that the trial court did not abuse its discretion in rejecting defendant's claim that he was coerced into entering the plea).

E. Conflict of Interest: Trial Counsel's "Book and Song" Deal with Brown
Brown's final claim on appeal is trial counsel's conflict of interest arising from his alleged effort to improperly obtain intellectual property rights in Brown's life story, recordings, songs, and poetry. Brown's motion alleged that "trial counsel operated at all times under multiple conflicts of interest, which prejudiced his ability to provide Mr. Brown with constitutionally effective assistance of counsel." As a subpart of this claim, Brown argued that trial counsel improperly sought to enter into agreements to obtain intellectual property rights in Brown's life story as well as his recordings, songs, and poetry. He also alleged that trial counsel sought to obtain these rights in order to enhance his wife's performing career.
Whether a defendant's counsel labored under an actual conflict of interest that adversely affected counsel's performance is a mixed question of law and fact. Quince v. State, 732 So.2d 1059, 1064 (Fla.1999) (citing Cuyler v. Sullivan, 446 U.S. 335, 342, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (addressing the issue of attorney-client conflict in the context of multiple defendant representation)). To prove an ineffectiveness claim premised on an alleged conflict of interest, the defendant must "establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 350, 100 S.Ct. 1708. A court must first determine whether an actual conflict existed, and then whether the conflict adversely affected the lawyer's representation. Herring v. State, 730 So.2d 1264, 1267 (Fla.1998). A lawyer suffers from an actual conflict of interest when he "actively represent[s] conflicting interests." Cuyler, 446 U.S. at 350, 100 S.Ct. 1708. To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests his interests were impaired or compromised for the benefit of the lawyer or another party. See Herring, 730 So.2d at 1267 (citing Buenoano v. Singletary, 74 F.3d 1078, 1086 n. 6 (11th Cir.1996)).
In Strickland, the Supreme Court explained its decision in Cuyler and how it related to the test for ineffective assistance of counsel. 466 U.S. at 692, 104 S.Ct. 2052. The Court said that a conflict of interest is so egregious that it clearly establishes the first prong of Strickland and gives rise to a presumption of prejudice satisfying the second prong, even in the absence of other proof of actual prejudice. Id. However, the Court noted that the presumption of prejudice for conflicts of interest is not on par with the per se rule of prejudice that exists for certain other Sixth Amendment claims such as the denial of the right to counsel. Id.
Trial counsel testified that any agreement entered into between Brown and himself, and anything relating to that agreement, happened after Brown's sentencing. Accordingly, he stated that Brown's defense was not affected because all these events occurred after sentencing. He testified that he met with Brown the morning of sentencing and that Brown indicated *158 that he had some documents for him. He gave counsel the documents, which turned out to be poems. Trial counsel testified that at that time he was concerned with the forthcoming sentencing proceeding and that "he didn't really look at them because that [was] not what [they] were dealing with at that moment." He testified that after the sentencing he looked at the documents and discussed with Brown the possibility of writing a book and converting the poems into music. Trial counsel followed up this discussion with a draft of a contract, but trial counsel signed that contract on October 8, 1991  months after the sentencing.
Trial counsel's evidentiary hearing testimony somewhat conflicted with his legal assistant's testimony. Her testimony implies that trial counsel's ambitions to use Brown's poems were present during the ongoing representation of Brown at trial. She testified that trial counsel "always wanted the poems that [Brown] wrote because he wanted his wife [sic] turn them into songs" and that when Brown gave her a poem, she would take it to trial counsel and "he did what he wanted with it."
The trial court weighed this testimony and made the following findings:
[T]he Court finds that Mr. Brown has failed to demonstrate that any actual conflict of interest existed between [trial counsel] and Mr. Brown as a result of [trial counsel]'s attempt to enter into intellectual property agreements to obtain the rights to Mr. Brown's life story. As such, no relief is warranted with respect to this portion of ground I-A.
As to Mr. Brown's second contention of conflict of interest whereby counsel allegedly sought to obtain rights to Mr. Brown's poetry and recordings in order to enhance his wife's performing career, conflicting testimony was presented at the post conviction evidentiary hearing regarding whether [trial counsel] had any proprietary interest during his representation of Mr. Brown to the detriment of his client. [Trial counsel] testified, as discussed above, that any supposed agreement between himself and Mr. Brown was made after sentencing.
. . . .
. . . [T]he Court realizes that there is conflicting testimony as to whether counsel's attempt to gain any proprietary interest on his own behalf or that of his wife occurred after the representation of Mr. Brown, and therefore in assessing the credibility of both witnesses, finds the testimony of [trial counsel] to be more credible. Therefore, Mr. Brown fails to show that [trial counsel] labored under any conflict of interest to the detriment of Mr. Brown.
As stated above, the trial court's factual findings are to be given deference. See Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999). So long as the trial court's decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence by the trial court. Id. We have repeatedly acknowledged the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact. See, e.g., Porter v. State, 788 So.2d 917, 923 (Fla.2001).
Here, the trial court's decision to believe trial counsel's testimony over his legal assistant's is a factual finding that establishes that no actual conflict existed during the course of Brown's representation. Cuyler, 446 U.S. at 350, 100 S.Ct. 1708.
*159 Brown also failed to demonstrate an actual conflict because he did not identify specific evidence in the record that suggests that his interests were impaired or compromised for the benefit of the lawyer or another party. See Herring, 730 So.2d at 1267. Without a showing of inconsistent interests, the conflict is merely possible or speculative, and under Cuyler, is "insufficient to impugn a criminal conviction." Id.

III. PETITION FOR WRIT OF HABEAS CORPUS
Brown raises three issues in his petition for writ of habeas corpus: (1) appellate counsel's alleged ineffectiveness for failing to raise in a motion for rehearing that invalidation of the HAC aggravator required reweighing of aggravating and mitigating factors; (2) appellate counsel's alleged ineffectiveness for failing to raise on appeal the admissibility of the "Bobby-Wanda" note; and (3) appellate counsel's alleged ineffectiveness for failing to challenge the testimony that was introduced at trial without objection.

A. Appellate Counsel's Ineffectiveness Regarding the HAC Aggravator
The requirements for establishing a claim based on ineffective assistance of appellate counsel parallel the standards announced in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "[The] [p]etitioner must show 1) specific errors or omissions which show that appellate counsel's performance deviated from the norm or fell outside the range of professionally acceptable performance and 2) the deficiency of that performance compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result." Wilson v. Wainwright, 474 So.2d 1162, 1163 (Fla.1985); see also Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000); Suarez v. Dugger, 527 So.2d 190 (Fla.1988). Procedurally barred claims not properly raised during trial cannot form a basis for finding appellate counsel ineffective absent a showing of fundamental error, which is defined as an error that "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." State v. Delva, 575 So.2d 643, 644-45 (Fla.1991).
Brown argues that appellate counsel rendered ineffective assistance of counsel when he failed to raise in a motion for rehearing that this Court, after concluding on direct appeal that the HAC aggravator did not apply, failed to adequately reweigh the remaining circumstances. On direct appeal, this Court held that the trial court erred in finding that the murder was especially heinous, atrocious, or cruel but determined that any error in instruction was harmless and that there was "no reasonable probability that the error contributed to the recommended sentence." Brown, 644 So.2d at 54. Reweighing of the circumstances was a non-issue because the Court determined that the error was harmless. Thus, the substance of this habeas claim is that Brown disagrees with this Court's harmless error analysis. Habeas petitions, however, should not serve as a second or substitute appeal and may not be used as a variant to an issue already raised. See Fotopoulos v. State, 838 So.2d 1122, 1134 (Fla.2002); Medina v. Dugger, 586 So.2d 317, 318 (Fla.1991).
Appellate counsel did file a motion for rehearing where he argued that "consideration of an invalid aggravating factor by either judge or jury invalidates the sentence." Appellate counsel also argued that "a mere `reasonable possibility' wherein this court cannot exclude a reasonable doubt that the error as to the judge's *160 instructions regarding aggravating circumstances did not affect the verdict is not a basis for concluding the error did not affect the verdict." Therefore, appellate counsel's motion did challenge this Court's harmless error analysis. Thus, no ineffective assistance of appellate counsel has been established.

B. Appellate Counsel's Ineffectiveness Regarding the "Bobby-Wanda" Note
Brown next argues that appellate counsel rendered ineffective assistance when he failed to challenge on direct appeal the admissibility of the "Bobby-Wanda" note that was introduced against him at trial. Brown wrote the note to a friend shortly after killing the victim. This issue was not preserved for appeal. Appellate counsel may not be deemed ineffective for failing to raise an unpreserved issue. See Freeman v. State, 761 So.2d 1055, 1070 (Fla.2000); Roberts v. State, 568 So.2d 1255, 1261 (Fla.1990). Nor did the failure to object to introduction of the note constitute fundamental error given the other evidence introduced at trial and the fact that the note itself does not contain any statements suggesting Brown's guilt.
At trial, a fingerprint expert testified that Brown's prints were on a credit card slip, a bank withdrawal slip, and a check endorsed by Brown. All these transactions were from the victim's accounts. Moreover, Brown's girlfriend testified that he did not have a car and that on the night of the murder he appeared at her house driving a car she had never seen. It was the victim's car. Brown, 644 So.2d at 53. She also testified that he had blood all over him and noticed that a pocket knife she normally kept on her nightstand was missing. Id. The victim was stabbed three times. Given this quantum of evidence, the failure to object to the "Bobby-Wanda" note was not the type of error that reached down into the validity of the trial itself to the extent that a guilty verdict could not have been obtained without the assistance of the alleged error.

C. Appellate Counsel's Ineffectiveness Regarding Testimony Admitted Without Objection
Brown argues that appellate counsel was ineffective for not challenging the admissibility of handwriting expert testimony introduced at the trial. The expert's opinion was that the defendant probably executed certain credit card signatures, "very probably" executed the endorsement on a certain check, and "executed" the handwriting which appeared on the note.
Brown's argument on this claim lacks specificity. The entire argument is as follows:
Handwriting expert testimony was introduced at the trial. The range of that expert opinion was that the defendant "probably executed" certain credit card signatures; "very probably" executed the endorsement on a certain check; and "executed" the handwriting which appeared on the note.
These statements of the expert, although not challenged by trial counsel as insufficient, clearly did not comport with the requirements of expert opinion testimony. There was no reasonable certainty expressed. Once again, these documents took on a greater import in this particular, circumstantial, prosecution.
Even if we assume that Brown is attempting to raise an ineffective assistance of appellate counsel argument, it is facially and legally insufficient. See Jones v. Dugger, 518 So.2d 295, 296 (Fla. 2d DCA 1987) (stating that a habeas corpus petition alleging ineffective assistance of appellate counsel based on advice to abandon an appeal of an attempted murder conviction was facially insufficient under Strickland where the petitioner did not attempt to show how the outcome of the case would *161 have been different had he persisted with the appeal).

IV. CONCLUSION
For the reasons stated, we affirm the trial court's denial of postconviction relief and deny Brown's petition for a writ for habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
QUINCE, J., recused.
ANSTEAD, J., concurring in part and dissenting in part.
I cannot agree with the majority's approval of defense counsel's minimal performance in this case. No mitigation was found by the trial court in this case, and at the postconviction evidentiary hearing it was established that not only was this defense counsel's first death penalty case, counsel's time records showed only a few hours devoted to investigating the defendant's background and other mitigation. The finding of no mitigation was upheld by this Court on appeal, although we struck the HAC aggravator, the most serious aggravator found by the trial court. And, even though the trial court found no mitigation and erroneously relied upon the HAC aggravator in imposing death, four jurors voted for life. Proper investigation and presentation of mitigation could easily have meant the difference between life and death in this case.
This case is almost identical to the circumstances presented in State v. Lewis, 838 So.2d 1102 (Fla.2002), where we approved a finding of ineffectiveness and an entitlement to a new penalty phase. In Lewis, we sharply criticized counsel for spending only eighteen hours in preparation, a number greater than involved here, and counsel's failure to investigate based on his client's inclination to waive mitigation.
As the cases above illuminate, the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated  this is an integral part of a capital case. Although a defendant may waive mitigation, he cannot do so blindly; counsel must first investigate all avenues and advise the defendant so that the defendant reasonably understands what is being waived and its ramifications and hence is able to make an informed, intelligent decision.
Id. at 1113 (footnote omitted). There is no justification for granting a new penalty phase in the one case but not in the other. When you couple defense counsel's failure to investigate and establish any mitigation, this Court's striking of the HAC aggravator and what we now know of the defendant's deprived childhood and abuse along with evidence of brain damage and epilepsy, you have a classic case of ineffectiveness of counsel.
NOTES
[1] The judge found that Brown had previously been convicted of a violent felony; that the murder was committed during the course of a robbery; and that the murder was especially heinous, atrocious, or cruel (HAC). See § 921.141, Fla. Stat. (1989).
[2] Brown claimed the trial court erred on the following points: (1) sufficiency of the evidence; (2) suppression of video and photos; (3) failure to compel discovery from Gainesville police concerning other crimes; (4) failure to compel discovery from police concerning other suspects; (5) failure to cure error when police officer testified that Brown was arrested on another warrant; (6) death-qualifying of jurors by State; (7) suppression of statements; (8) speedy trial violation; (9) separate counsel for penalty phase; (10) instruction on HAC; (11) cold, calculated and premeditated (CCP) aggravator not supported by evidence; (12) failure to find statutory mitigation; (13) proportionality; (14) failure to find nonstatutory mitigation.
[3] The first five claims alleged that: (1) Brown's conviction and sentence were constitutionally unreliable because of trial counsel's improper interest in the outcome of the trial, trial counsel's legal assistant's improper relationship with the lead detective, and trial counsel's improper delegation of authority to his assistant; (2) the State's actions and omissions violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), rendered defense counsel's representation ineffective, and prevented a full adversarial testing; (3) Brown was denied effective assistance of counsel and an adversarial testing during the guilt phase; (4) Brown received ineffective assistance of counsel and was denied adversarial testing at the penalty phase; and (5) trial counsel failed to perform an adequate background investigation.
[4] These are: (1) prosecutorial misconduct (should have been raised on direct appeal); (2) alleged exclusion of black jurors (should have been raised on direct appeal); (3) trial court improperly refused to excuse several prospective jurors for cause (should have been raised on direct appeal); (4) trial court's failure to grant additional peremptory challenges (should have been raised on direct appeal); (5) jury consideration of improper aggravators (should have been raised on direct appeal); (6) the judge's sentencing phase jury instructions diminished the jury's sense of responsibility towards sentencing (should have been raised on direct appeal); (7) the sentencing jury instructions shifted the burden to Brown to prove that death was inappropriate (should have been raised on direct appeal); (8) the trial court erred when it admitted certain incriminating statements (raised on direct appeal); (9) trial counsel was ineffective at the suppression hearing (facially and legally insufficient); (10) denial of Brown's right to speedy trial (raised on direct appeal); (11) the trial court erroneously found three aggravating circumstances (should have been raised on direct appeal); (12) introduction of nonstatutory aggravators (should have been raised on direct appeal); (13) Rule 4.3.5(d)(4), Rules Regulating the Florida Bar, is unconstitutional because it impedes defendants' ability to fully explore possible jury misconduct and bias (should have been raised on direct appeal); (14) trial court erred in not instructing the jury on mercy and that the prosecutor made improper arguments regarding mercy and sympathy toward the defendant (should have been raised on direct appeal); (15) the HAC aggravator was not proven beyond a reasonable doubt (raised on direct appeal); (16) the trial court failed to find mitigating circumstances (should have been raised on direct appeal); (17) the jury was improperly instructed that it could rely on two independent grounds to support the verdict (should have been raised on direct appeal); and (18) the cumulative errors in Brown's case warranted relief. The cumulative error claim is without merit. See Vining v. State, 827 So.2d 201, 209 (Fla.2002) (stating that where the alleged individual errors are without merit, the contention of cumulative error is also without merit).
[5] Appellate counsel admits that the penalty phase did contain some testimony on Brown's background. He argues, however, that Dr. Dee's conclusions were impeached because they were drawn from "self reported" information and that the testimony of Brown's mother was inadequate because "she was not part of her son's life during some of the most abusive and deadly periods of his upbringing."
[6] As part of his evaluation, Dr. Dee reviewed the findings of Dr. Garcia, who examined Brown and noted that he suffered from epilepsy and was suffering from a weakness on the left side of his body indicating that there was something wrong in the cerebral cortex above the tentorium.
[7] For example, Betty H. Highlander testified about Brown's musical and writing abilities and his interaction with his wife and stepchildren. Carol Smith testified about Brown's interaction with his stepchildren. The testimony about Brown's musical abilities was cumulative as well because, at the penalty phase, trial counsel read one of the defendant's poems and introduced it into the record.
[8] The dissent, which relies on time records, overlooks this language in Lewis. Dissenting op. at 161.
[9] This Court noted that the following information regarding Lewis was available if a reasonable investigation had been conducted: (1) that his mother was an alcoholic and frequently promiscuous; (2) that he was exposed to violence and severe neglect; (3) that he suffered a skull fracture at the age of two or three which required two weeks of hospitalization, and his mother refused to take him to the hospital so Lewis had to wait until his father returned home from work; (4) that he observed his father's violence and domestic abuse on a daily basis, and as a child he declared that he wanted to be blind so he would not have to see what occurred at his home; (5) that following his parents' separation, they tried to kidnap the children from each other; (6) that Lewis was turned over to foster care, but the neglect and abuse he had suffered were so great that the foster care system could not take care of his needs; (7) that while in foster care, he was frequently shuttled from place to place; (8) that he had diminished mental capacity and suffered from direct inferential thinking; (9) that he had brain damage; (10) that he had a recorded history of serious alcohol and drug abuse, including the frequent use of marijuana and LSD; (11) that there was corroborating evidence that Lewis had consumed a considerable amount of alcohol on the night of the crime; and (12) that Lewis had undergone neurological testing and an EEG because he was having "temper outbursts," followed by occasional amnesia. Lewis, 838 So.2d at 1110-11.
[10] Contrary to the dissent's assertions, "what we now know of the defendant's deprived childhood and abuse," dissenting op. at 161, is not different from the information that was presented to the jury during the penalty phase.
[11] Brown cites Williams v. State, 777 So.2d 947 (Fla.2000), and argues that "while not a ground for substantive relief, ineffective assistance of postconviction counsel can be a basis for procedural relief." However, that case simply held that defendants could file belated appeals of trial courts' denials of postconviction relief motions that were untimely due to counsels' neglect. Id. at 950. We have not extended this holding beyond those facts.